James E. HERNANDEZ,
Plaintiff-Appellant,

v.

CITY OF LAFAYETTE et al.,
Defendants-Appellees.

No. 80–3160.

United States Court of Appeals,
Fifth Circuit.
Unit A

May 1, 1981.

Rehearing Denied June 30, 1981.
See 649 F.2d 336.

John G. Torian, II, Michael G. Durand, Lafayette, La., for plaintiff-appellant.

Ross, Hardies, O'Keefe, Babcock & Parsons, Wendy U. Larsen, Charles L. Siemon, Richard F. Babcock, Chicago, Ill., for City of Lafayette.

Before GOLDBERG, REAVLEY and TATE, Circuit Judges.

REAVLEY, Circuit Judge:

In this § 1983 action, plaintiff, James E. Hernandez, appeals from the district court's granting of summary judgment in favor of defendants, the City of Lafayette, Louisiana, and its mayor. The plaintiff alleged that the city, through its zoning ordinances and its failure to rezone his land, had deprived him of property without due process of law and without just compensation under the Fifth and Fourteenth Amendments. The district court granted defendants' motion for judgment on the pleadings, which was converted to a motion for summary judgment by the plaintiff's filing of additional documentary evidence,[1] on the ground that the city and its mayor were

---

1. *See* Fed.R.Civ.P. 12(c).

immune from suit under 42 U.S.C. § 1983. We affirm the district court's judgment as to the mayor, but reverse as to the city.

### Background

James E. Hernandez is the owner of a 16.7 acre tract of land situated within the corporate limits of the City of Lafayette, Louisiana. It is located immediately to the south of South College Drive at West Bayou Parkway and is bounded on the east by Coulee Mine,[2] on the west by West Bayou Parkway and the sewage treatment plant access road, and on the south by the Southside Sewerage Treatment Plant.

At the time this suit was filed in 1979, the Hernandez property had been zoned R1–A (single family residential) for more than ten years. It remains zoned R1–A to this day. On August 12, 1975, plaintiff made his first request with the Lafayette City Planning Commission for a change in zoning. He requested that the property be rezoned from R1–A to B1–M (medical office complex). Shortly thereafter, the city began planning a realignment of South College Drive and West Bayou Parkway, which borders plaintiff's land. The proposed realignment would bisect the Hernandez property into two unequal parts, which would necessitate the city's expropriation of the right-of-way by eminent domain proceedings.

In December of 1975, an ordinance to rezone the Hernandez property from R1–A to B1–M, which had been recommended by the planning commission's staff, was introduced by unanimous vote of the Lafayette City Council. A vote on final approval of the rezoning ordinance was postponed several times during the early part of 1976. On March 16, 1976, the ordinance to rezone the Hernandez property to B1–M was again scheduled to come up for final approval before the city council. At this meeting, the council was also to consider certain rights-of-way which plaintiff agreed to grant the city in return for final approval of the rezoning ordinance. Because of the impending city council election, however,

the council voted to table the rezoning ordinance.

The council took no further action on the rezoning of plaintiff's property until January 11, 1977, when it adopted a resolution requesting the planning commission to reconsider the matters contained in plaintiff's rezoning petition filed in August of 1975. After public hearings on plaintiff's rezoning petition, the planning commission recommended that the request to rezone plaintiff's property from R1–A to B1–M be denied. The city council agreed, denying final approval to the rezoning ordinance. With respect to this rezoning ordinance, one councilman was recorded as stating that "if we change zoning to another classification we are going to have to pay more money when we create the right-of-way."

On August 9, 1977, the plaintiff filed a request with the city to change the zoning classification of his property from R1–A to R2 (multi-family residential). The staff of the city planning commission recommended that an R2 classification be granted for the Hernandez property. After conducting a public hearing on the subject, the planning commission voted to recommend the change to R2 to the city council. On November 17, 1977, the city council tabled the rezoning request for an R2 classification and ordered the planning commission to conduct an additional hearing to study possible zoning options for the Hernandez property. The council's reason for this action was to allow the planning commission to consider a B1–M classification in addition to the R2 classification.

On December 18, 1977, the city council voted to appropriate $140,000 for an engineering feasibility study for the proposed realignment of West Bayou Parkway. On January 9, 1978, the city planning commission, contrary to the city council's instructions, voted to exclude the Hernandez rezoning matter from a comprehensive hearing scheduled for February 8, 1978. The commission's reason for this action was that it wanted to wait and see if the proposed

---

2. Coulee Mine is a medium-sized stream.

realignment project would become a reality before it took any action. The city council upheld the planning commission's action, basing its decision on the belief that it would be better to postpone any final decision on rezoning the Hernandez property until the city had determined the route of the proposed realignment project.

After attempting to obtain a change in zoning for two and one-half years, and believing that no zoning change would be forthcoming until the city had acquired a right-of-way over his property at either R1–A prices[3] or as part of a concession by him in return for the desired zoning classification, the plaintiff, on February 3, 1978, filed suit in state court for a mandatory injunction to compel the city to change the R1–A zoning classification on his property. On February 21, 1978, the city council voted to rezone the Hernandez property to R2. The mayor, however, vetoed this measure, and the council failed to override the mayor's veto. In January of 1979, the city attorney began negotiations with the plaintiff to settle the pending lawsuit in state court, which was set for trial on February 7, 1979.

An informal settlement agreement was reached whereby the city would rezone the plaintiff's property to a B1–O classification (limited office). The settlement agreement was signed by both the city council and the mayor. The plaintiff notified the state court of the settlement agreement, and the trial date was cancelled. One month later, the mayor refused to sign the formal settlement agreement that would have terminated the state court suit. Moreover, the mayor subsequently vetoed an ordinance, unanimously passed by the city council, that

would have rezoned the plaintiff's land to a B1–O classification. The council was again unsuccessful in its attempt to overturn the mayor's veto. A trial date in the state court suit was reset for January of 1980.[4] In the aftermath of these events, the city council repealed the ordinance declaring the West Bayou Parkway realignment a "public necessity" upon advice of the city's legal counsel that the city would be in jeopardy of losing the state court lawsuit unless the proposed realignment project was abandoned.

In March of 1979, plaintiff filed this suit under 42 U.S.C. § 1983. He complains that because the city planned to build a road through his property, it delayed making a final decision on the rezoning of his property in an effort to maintain the depressed market value of his land as zoned R1–A so that the city's expropriation costs of a right-of-way across plaintiff's land would be kept to a minimum. The district court, noting that zoning is a legislative function of a municipality, *Four States Realty Co., Inc. v. City of Baton Rouge*, 309 So.2d 659, 664 (La.1975), and that after *Monell*[5] a municipality is not absolutely immune when exercising its legislative functions, held that in this case, where the claimed deprivation is the result of the city's failure to act promptly (rather than its affirmative enactment of an unconstitutional law or official policy) and where no discrimination or equal protection deprivation is asserted,[6] the city is immune from suit under § 1983. With respect to the mayor, the district court concluded that the mayor was acting in a legislative capacity when he vetoed the two ordinances which would have rezoned

---

**3.** It is undisputed that the market value of the Hernandez property would be greater under a zoning classification less restrictive than R1–A.

**4.** The state court rendered judgment in plaintiff's favor, finding that the city's actions were unreasonable, arbitrary and capricious and had deprived the plaintiff of all practical use of his property.

**5.** *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**6.** The district court incorrectly stated that no discrimination or denial of equal protection was alleged in this case. In paragraphs eight and nine of his original complaint, the plaintiff alleged equal protection violations. That the district court incorrectly believed no equal protection violation was alleged makes no difference to our decision. For purposes of our opinion, we assume the absence of any equal protection claim by plaintiff.

the Hernandez property and held, therefore, that the mayor enjoyed the same absolute legislative immunity from suit under § 1983 that is accorded to state and local legislators.

### Absolute Legislative Immunity for the Mayor?

In *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), the Supreme Court recognized absolute immunity from suit under 42 U.S.C. § 1983 for state legislators.[7] *See also, Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967). This absolute immunity from suit under § 1983 was extended to regional legislators in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). Although not addressing the question of "[w]hether individuals performing legislative functions at the purely local level, as opposed to the regional level, should be afforded absolute immunity from federal damage claims . . . ," *id.* at 404, 99 S.Ct. at 1179, the logical implication of the Court's opinion in *Lake Country Estates* is that the reasoning for clothing federal, state and regional legislators with absolute immunity is equally applicable to affording local legislators with such immunity. *Id.* at 406–09,

99 S.Ct. at 1180–81 (Marshall, J., dissenting);[8] *Owen v. City of Independence*, Mo., 445 U.S. 622, 663 n.6, 100 S.Ct. 1398, 1422 n.6, 63 L.Ed.2d 673 (1980) (Powell, J., dissenting).

Three courts of appeals, including this circuit by dictum, have interpreted the reasoning of *Lake Country Estates* to compel an extension of absolute immunity under § 1983 to local legislators. *Rheuark v. Shaw*, 628 F.2d 297, 304 n.12 (5th Cir. 1980); *Bruce v. Riddle*, 631 F.2d 272 (4th Cir. 1980); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 611–14 (8th Cir. 1980). Moreover, in *Universal Amusement Co., Inc. v. Hofheinz*, 616 F.2d 202, 205 (5th Cir. 1980), this court held, without discussing the *Lake Country Estates* decision, that city council members possessed absolute legislative immunity from liability under § 1983 for conduct in the furtherance of their legislative duties.

However, the panel in *Universal Amusement Co. v. Hofheinz* did not cite or discuss *Crowe v. Lucas*, 595 F.2d 985, 990 (5th Cir. 1979), in which a panel of this court held that local legislators possessed qualified immunity under § 1983, instead of absolute immunity, when acting in a legislative capacity.[9] "As a panel of this Court, we are

---

7. The Court reasoned that by enacting § 1983, Congress did not mean to abrogate the historical tradition of legislative immunity observed in England and the American Colonies and preserved in the formation of state and national governments here. 341 U.S. at 375–76, 71 S.Ct. at 787–88.

8. In his dissent, Justice Marshall comments that

"the majority's reasoning in this case leaves little room to argue that municipal legislators stand on a different footing than their regional counterparts. Surely the Court's supposition that the 'cost and inconvenience and distractions of a trial' will impede officials in the 'uninhibited discharge of their legislative duty' . . . applies with equal force whether the officials occupy local or regional positions."

440 U.S. at 408, 99 S.Ct. at 1181.

9. In *Crowe v. Lucas*, this court accorded qualified, as opposed to absolute, immunity under § 1983 to a defendant who "wore two hats," that of a municipal judge and that of a city

alderman. The panel in *Crowe v. Lucas* concluded the jury could reasonably have found that the defendant's actions in conspiring against the plaintiff and in ordering his arrest at a meeting of the board of aldermen were taken as an alderman rather than as a judge. The panel's reasoning was that "[m]aintaining order at a Board of Aldermen's meeting is normally a function performed by an Alderman rather than a Municipal Judge." 595 F.2d at 990. Although *Crowe v. Lucas* was decided nearly three months after the decision in *Lake Country Estates* was handed down, no mention of *Lake Country Estates* was made in the *Crowe* opinion.

After recognizing the Supreme Court has never decided whether the immunity accorded to officials in the positions of mayor and alderman is an absolute or "qualified" immunity, the panel in *Crowe v. Lucas* expressly rejected the defendant's argument that it should rule in favor of absolute immunity. The defendants had argued the application of absolute immunity, citing *Tenney v. Brandhove, supra*, which accorded absolute immunity to state legislators. The

without power to overrule a decision of another panel. That task falls solely to the full Court sitting *en banc." Ford v. United States*, 618 F.2d 357, 361 (5th Cir. 1980). Moreover, the panel in *Universal Amusement Co. v. Hofheinz* was also without power "to disregard the precedent set by a prior panel [in *Crowe*], even though it conceives error in the precedent," *Davis v. Estelle*, 529 F.2d 437, 441 (5th Cir. 1976), absent some intervening contrary authority from the Supreme Court or the *en banc* court. *See Robinson v. Parsons*, 560 F.2d 720, 721 n.2 (1977). However, we conclude that sufficient contrary authority from the Supreme Court has intervened since the decision in *Crowe v. Lucas*, thus enabling us to disregard that precedent.[10]

◼ We hold, in agreement with at least five of the Justices of the Supreme Court, *see Owen v. City of Independence*, 445 U.S. at 663 n.6, 100 S.Ct. at 1422 n.6 (Powell, J., dissenting, joined by Burger, C.J., Stewart & Rehnquist, J.J.); *Lake Country Estates*, 440 U.S. at 406–09, 99 S.Ct. at 1180–81 (Marshall, J., dissenting), that local legislators are entitled to absolute immunity from suit under § 1983 for conduct in the fur-

therance of their duties. In so holding, we also note that the *Crowe* panel's rationale for the decision not to accord a city alderman absolute immunity does not survive the holding and reasoning of *Owen v. City of Independence*, 445 U.S. at 650–53, 100 S.Ct. at 1415–16 (rejecting the contention that a municipality enjoyed qualified immunity for its unconstitutional acts in discharging an employee, while recognizing that most government officials enjoyed such immunity).

Having decided that local legislators are entitled to absolute immunity from federal damage claims for conduct while acting in a legislative capacity, we now turn to the specific question raised here, that is, whether in this case the mayor of the City of Lafayette is entitled to absolute legislative immunity.

◼ Although the mayor of the City of Lafayette is the elected chief executive officer of the city, he is entitled to absolute immunity from suit for acts taken in a legislative capacity. *See Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 731–34, 100 S.Ct. 1967, 1974–75, 64 L.Ed.2d 641 (1980).[11] We con-

panel reasoned that since the Supreme Court, through language in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 701, 98 S.Ct. 2018, 2041, 56 L.Ed.2d 611 (1978), had implied that municipalities might possess some immunity under § 1983, but not absolute immunity, it would not accord absolute immunity to municipal legislators because "[i]t would be anomalous to establish a greater degree of immunity for municipal officials than is given to the city itself." *Crowe v. Lucas*, 595 F.2d at 989.

The Supreme Court's language in *Monell*, from which the panel in *Crowe* inferred that municipalities possessed some degree of immunity, is as follows:

"Since the question whether local government bodies should be afforded some form of official immunity was not presented as a question to be decided on this petition and was not briefed by the parties nor addressed by the Courts below, we express no views on the scope of any municipal immunity beyond holding that municipal bodies sued under § 1983 cannot be entitled to an absolute immunity, lest our decision that such bodies are subject to suit under § 1983 'be drained of meaning.' *Scheuer v. Rhodes*, 416 U.S. 232, 248, 94 S.Ct. 1683, 1692, 40 L.Ed. 90 (1974)."

436 U.S. at 701, 98 S.Ct. at 2041, *quoted in Crowe v. Lucas*, 595 F.2d at 989.

**10.** Moreover, as the *Crowe* opinion later clarifies, the defendant in question really was not "wearing two hats." Instead, he legitimately wore only the hat of a municipal judge because a state court had previously issued an order voiding the results of the election in which the defendant had defeated the plaintiff for the office of city alderman, and under state law the plaintiff was entitled to serve as an alderman until another election could be held. 595 F.2d at 993. Hence, under a narrow reading, *Crowe v. Lucas* simply held that a municipal judge acting without authority in the capacity of a local legislator, and thus not performing a judicial function, was entitled to only a qualified immunity.

The panel, however, did recognize that if the defendant had been acting in a judicial capacity, he would have been entitled to absolute immunity from suit, unless such judicial acts were done in "clear absence of all jurisdiction." 595 F.2d at 989.

**11.** In *Supreme Court of Virginia v. Consumers Union*, the United States Supreme Court held that the Virginia Supreme Court and the jus-

clude that when the mayor of a municipality vetoes an ordinance passed by the city's legislative body, he performs a legislative function and is entitled to absolute immunity from a civil suit complaining about actions taken in his legislative capacity. *Cf. Buckley v. Valeo*, 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976) (observing that by no means does the Constitution contemplate a total separation of powers between the three branches of government since "[t]he President is a participant in the law-making process by virtue of his authority to veto bills enacted by Congress"); *Edwards v. United States*, 286 U.S. 482, 490, 52 S.Ct. 627, 630, 76 L.Ed. 1239 (1932) (noting "the legislative character of the President's function in approving or disapproving bills" and that "[t]he President acts legislatively under the Constitution, [although] he is not a constituent part of the Congress"); *Smiley v. Holm*, 285 U.S. 335, 373, 52 S.Ct. 397, 401, 76 L.Ed. 795 (1932) (recognizing the legislative character of a governor's participation in a state's law-making process through his veto power); *La Abra Silver Mining Company v. United States*, 175 U.S. 423, 453, 20 S.Ct. 168, 178, 44 L.Ed. 223 (1899) (commenting that the Constitution authorizes "the President to perform certain functions of a limited number that are legislative in their general nature . . .").

The mayor's veto, like the veto of the President or a state governor, is undeniably a part of the legislative process. It differs only in that it takes place on the local level. When the mayor exercises his veto power, it constitutes the policy-making decision of an individual elected official. It is as much an exercise of legislative decision-making as is the vote of a member of Congress, a state legislator, or a city councilman. We, therefore, hold that the district court properly dismissed plaintiff's action against the mayor because the mayor was absolutely immune from suit in connection with his vetoes of the ordinances to rezone plaintiff's land.[12]

### Absolute Legislative Immunity From Damages for the City Itself?

Approximately five months before *Owen v. City of Independence, Mo.*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.?d 673 (1980), was decided by the Supreme Court, the district court in this case, while recognizing that after *Monell* a municipality is not absolutely immune from a § 1983 action, held that the City of Lafayette was immune from the plaintiff's § 1983 suit.[13] In support of the district court's decision rendering summary judgment in its favor, the City of Lafayette argues on appeal that it is entitled to an absolute legislative immunity from liability in damages—although not immunity from

tices thereof were entitled to absolute legislative immunity from suit in connection with the court's promulgation of disciplinary rules for attorneys which comprised the State's Bar Code. The Supreme Court reasoned that since .the Virginia court exercised the State's entire legislative power with respect to regulating attorneys' conduct, the members of that court were the State's legislators for the purpose of issuing the Bar Code, and, therefore, that the Virginia court and its members were immune from suit when acting in their legislative capacity. 446 U.S. at 733, 100 S.Ct. at 1975.

**12.** On motion for new trial, the plaintiff argued that although the mayor might possess absolute immunity in connection with his vetoes, he would only be entitled to qualified immunity with respect to his other conduct complained about in the pleadings. We conclude the district court properly overruled the motion for new trial on the ground that the mayor's vetoes were the culmination of all of plaintiff's complaints. This is so because the mayor's other

actions, aside from the vetoes of the rezoning ordinances, could not have resulted in a denial of any reasonable use of plaintiff's property and thus constituted an unconstitutional taking without just compensation.

**13.** The district court stated:

"Thus, it is clear that the City of Lafayette, when exercising its legislative functions, is not absolutely immune from a 1983 action. It is not clear, however, that the city should have no immunity whatsoever. I do not here attempt to define the scope of the limited immunity which does exist. I do conclude that where, as here, the deprivation claimed is the result of a) a city's failure to act promptly rather than its affirmative enactment of an unconstitutional law or official policy and b) no discrimination or equal protection deprivation is asserted, the city is immune from suit under 42 U.S.C. § 1983."

suit for prospective relief [14]—for actions taken by it in a legislative capacity.[15]

In *Owen v. City of Independence*, the Supreme Court held that a municipality was not entitled to a qualified immunity under § 1983 based on the good faith of its officials. Justice Brennan, writing for the majority, summarized the Court's decision in *Owen* as follows:

"In sum, our decision *holding that municipalities have no immunity from damages liability flowing from their constitutional violations* harmonizes well with developments in the common law and our own pronouncements on official immunities under § 1983 . . . .

"We believe that today's decision, together with prior precedents in this area, properly allocates these costs among the three principals in the scenario of the § 1983 cause of action: the victim of the constitutional deprivation; the officer whose conduct caused the injury; *and the public, as represented by the municipal entity*. The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury. The offending official, so long as he conducts himself in good faith, may go about his business secure in the knowledge that a qualified immunity will protect him from personal liability for damages that are more appropriately chargeable to the populace as a whole.[16] And the public will be forced to bear only the costs of injury inflicted by the 'execution of a government's policy or custom, whether *made by its lawmakers* or by those whose edicts or acts may fairly be said to represent official policy.' *Monell v. New York City Dept. of Social Services*, 436 U.S., at 694, 98 S.Ct. at 2038."

445 U.S. at 655–59, 100 S.Ct. at 1418–19 (emphasis added).

The Supreme Court in *Owen* reasoned that the concerns that justified its previous decisions conferring immunities under § 1983 on various governmental officials "are less compelling, if not wholly inapplicable, when the liability of the municipal entity is at issue." 445 U.S. at 651, 100 S.Ct. at 1416. In a footnote to that statement, the Court commented that its decision in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), "also [had] recognized that the justifications for immunizing officials from personal liability have little force when suit is brought against the governmental entity itself." *Owen*, 445 U.S. at 651–55 n.37, 100 S.Ct. at 1416–17 n.37.

In *Lake Country Estates*, the plaintiffs had brought a § 1983 suit against the members of the Tahoe Regional Planning Agency (TRPA), alleging that the regional planning agency had adopted a land use ordinance, which destroyed the economic value of their land, and thereby had "taken their property without due process of law and without just compensation in violation of the Fifth and Fourteenth Amendments to the Constitution . . . ." 440 U.S. at 394, 99 S.Ct. at 1174. The plaintiffs sought both money damages and injunctive relief. However, their complaint did not name the Tahoe Regional Planning Agency, the governmental entity, as a party-defendant. Although holding that to the extent the members of TRPA "were acting in a capacity comparable to that of members of a state legislature, they are entitled to absolute immunity from federal damages liability," 440 U.S. at 406, 99 S.Ct. at 1180, the Court cautioned that if the members of the planning agency "have enacted unconstitutional legislation, there is no reason why relief against TRPA itself should not adequately vindicate [plaintiffs'] interests." 440 U.S. at 404 n.29, 99 S.Ct. at 1179 n.29.

---

**14.** In this § 1983 action, the plaintiff has not sought injunctive or declaratory relief; instead, he seeks only damages to compensate him for an unconstitutional deprivation of property.

**15.** Zoning is a legislative function of government. *South Gwinnett Venture v. Pruitt*, 491

F.2d 5, 6 (5th Cir.), *cert. denied*, 416 U.S. 901, 94 S.Ct. 1625, 40 L.Ed.2d 119 (1974).

**16.** In our case, the offending officials are protected by absolute legislative immunity.

■ We consider the Supreme Court's decision in *Owen* and its caveat in *Lake Country Estates* to be dispositive of the city's argument and hold that the City of Lafayette is not entitled to a legislative immunity from damages under § 1983 in connection with its zoning regulations. Our decision is buttressed by language in *Owen* which squarely rejects the argument the city asserts here. There, in reviewing the history of municipal immunity from tort liability, the Court wrote:

"To be sure, there were two doctrines that afforded municipal corporations some measure of protection from tort liability. The first sought to distinguish between a municipality's 'governmental' and 'proprietary' functions; as to the former, the city was held immune, whereas in its exercise of the latter, the city was held to the same standards of liability as any private corporation. The second doctrine immunized a municipality for its 'discretionary' *or 'legislative' activities,* but not for those which were 'ministerial' in nature. *A brief examination of the application and the rationale underlying each of these doctrines demonstrates that Congress could not have intended them to limit a municipality's liability under § 1983."*

*Owen,* 445 U.S. at 644, 100 S.Ct. at 1412 (emphasis added).

The city, however, attempts to distinguish *Owen* from the case before us and suggests that we should not extend *Owen* beyond its factual setting. The city asserts that "*Owen* was, as was *Monell* . . ., an employment case where a wrongfully terminated employee sought back pay as damages from a municipal employer. As such, *Owen* is factually distinguishable from this case wherein Mr. Hernandez complains that zoning legislation of the City of Lafayette is unconstitutional." Furthermore, the city argues that "[t]he immunity at issue in *Owen* was the qualified or limited 'good faith' immunity which attaches to the acts of *executive, administrative* and *managerial* officials, while the [district court in the present case] invoked an absolute *legislative* immunity from damages (not suit) for acts taken in a legislative capacity."

The city misperceives the circumstances of the *Owen* case. *Owen* was not merely an employment case; it involved the termination of a high ranking city official—the city police chief. Moreover, the alleged constitutional violation giving rise to a § 1983 cause of action was not the police chief's termination, since he had no property interest in that office under state law, but rather the city council's false public accusations, which had blackened his reputation, thus depriving him of a liberty interest without due process of law. 445 U.S. at 630–34, 100 S.Ct. at 1405–06.

In *Owen,* a city councilman had obtained a copy of an unpublished investigative report regarding the police chief's administration of the police property room. At a regularly scheduled meeting of the city council, this councilman made a statement concerning the investigation. In his statement, the councilman made several allegations of misconduct and possible illegal activity on the part of the police chief. Thereafter, the city council passed a motion to release the investigative report to the news media and to turn over the information to the local prosecuting attorney for presentation to the grand jury. In the motion, the city council also directed the city manager to take appropriate action against all persons involved in the misconduct. 445 U.S. at 626–29, 100 S.Ct. at 1403–04.

Therefore, the constitutional violation about which the plaintiff in *Owen* could legally complain was caused by the members of the city council while performing a legitimate legislative function, *i. e.* conducting an investigation, which is an established part of representative government. *See Tenney v. Brandhove,* 341 U.S. at 377–78, 71 S.Ct. at 788–89 (in which the Court recognized that state legislators, who were part of a committee that allegedly "smeared" plaintiff during an investigation, were acting in a legislative capacity in connection with the investigation and were entitled to absolute immunity under § 1983). In view of the Supreme Court's rejection in

*Owen* of a municipality's claim of qualified immunity under § 1983 for a constitutional violation occasioned by the members of its city council while acting in a legislative capacity, the City of Lafayette's argument here, *i. e.* that it is entitled to absolute legislative immunity from damages for its legislative acts, melts away.

Moreover, a finding concerning the existence of § 1983 immunity must be "predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Imbler v. Patchman,* 424 U.S. 409, 421, 96 S.Ct. 984, 990, 47 L.Ed.2d 128 (1976), *quoted in Owen v. City of Independence,* 445 U.S. at 638, 100 S.Ct. at 1409. In *Owen* the Court stated:

> "Where the immunity claimed by the defendant was well established at common law at the time § 1983 was enacted, and where its rationale was compatible with the purposes of the Civil Rights Act, we have construed the statute to incorporate that immunity. *But there is no tradition of immunity for municipal corporations,* and neither history nor policy support a construction of § 1983 that would justify the qualified immunity accorded the city of Independence by the Court of Appeals."

445 U.S. at 638, 100 S.Ct. at 1409 (emphasis added).

In this case, the plaintiff has alleged that the city's R1–A zoning classification of his property has denied him any reasonable, economically viable use of his land, and, therefore, constituted a taking without just compensation in violation of the Fifth and Fourteenth Amendments. The summary judgment evidence, viewed "in the light most favorable to the non-movant plaintiff," *Lee v. National Life Assurance Co.,* 532 F.2d 524, 529 (5th Cir. 1980), supports the plaintiff's contention that the R1–A zoning classification denied him any reasonable, economically viable use of his property.[17] It is well established that the application of a general zoning law to particular property will effect a "taking" of that property under the just compensation clause of the Fifth Amendment[18] if the ordinance denies the owner an economically viable use of his land. *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 138 n.36, 98 S.Ct. 2646, 2666 n.36, 57 L.Ed.2d 631 (1978); *accord, Maher v. City of New Orleans,* 516 F.2d 1051, 1065 (5th Cir. 1975), *cert. denied,* 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 (1976); *Trustees Under the Will of Pomeroy v. Town of Westlake,* 357 So.2d 1299, 1304 (La.App. 1978). Since this court is unaware of any well-established tradition of municipal immunity from damages to compensate for uncompensated takings,[19] we cannot read

---

17. The evidence when viewed in the light most favorably to the plaintiff shows that the Hernandez property was not suited for an economically viable development under its present zoning classification (single family dwellings). This is so because it was bordered by a sewage treatment plant, the Coulee Mine flood plain extended on portions of the land, various easements limited the size and placement of residences on the proposed lots, and the irregular shape of the property limited the number of lots that could be created.

18. The just compensation clause of the Fifth Amendment was made applicable to the states through the Fourteenth Amendment in *Chicago, B. & Q. R. Co. v. City of Chicago,* 166 U.S. 226, 236, 17 S.Ct. 581, 584, 41 L.Ed. 979 (1897). The clause provides: "... nor shall private property be taken for public use, without just compensation." U.S.Const. Amend. V.

19. For example, we note that under Louisiana law there is no immunity for the state and its political subdivisions from damages for an uncompensated "taking." *See, e. g., Boothe v. Department of Public Works,* 370 So.2d 1282, 1284 (La.App.1979) (in which the court upheld a damage award for governmental "appropriation" of private property, *i. e.* the taking of private property by a public body without the proper exercise of eminent domain); *Arkansas Louisiana Gas Co. v. City of Minden,* 341 So.2d 607, 610 (La.App.1977) (holding that the city, by requiring plaintiff's pipelines to be lowered after the city had increased the depth and width of a stream that traversed them, had exercised its power of eminent domain through a police power regulation and must compensate the plaintiff for the reasonable cost of lowering the pipelines); *Benard v. State,* 127 So.2d 774, 778 (La.App.1961) (holding that an action for "appropriation" of private property,

into § 1983 an absolute immunity from damages for the City of Lafayette arising from its zoning regulations that result in the "taking" of private property for public use without just compensation.[20]

The legislative history of § 1983 also contradicts a grant of absolute immunity from damages to a municipality for any uncompensated "taking" of private property for public use, occurring as a result of zoning regulations that deny property owners any economically viable use of their land. As noted by the Supreme Court in *Monell*, Representative Bingham,[21] in discussing § 1 of the bill that eventually became the Civil Rights Act of 1871—now codified as 42 U.S.C. § 1983—explained "that he had drafted § 1 of the Fourteenth Amendment with the case of *Barron v. Mayor of Baltimore*, 7 Pet. 243, 8 L.Ed. 672 (1833), especially in mind. 'In [that] case the *city* had taken private property for a public use, without compensation . . ., and there was no redress for the wrong . . . .'" 436 U.S. at 686–87, 98 S.Ct. at 2033–34 (quoting Cong. Globe App., 42d Cong., 1st Sess. 84 (1871)) (emphasis, omissions and brackets in original).

After commenting that Representative Bingham's remarks had clearly disclosed his view that such takings by cities, as had occurred in *Barron*, would be redressable under § 1983,[22] the Court stated:

> "More generally, and as Bingham's remarks confirm, § 1 of the bill [§ 1983] *would logically be the vehicle by which Congress provided redress for takings, since that section provided the only civil remedy for Fourteenth Amendment violations and that Amendment unequivocally prohibited uncompensated takings.* Given this purpose, it beggars reason to suppose that Congress would have exempted municipalities from suit, insisting instead that *compensation* for a taking come from an officer in his individual capacity rather than from the government unit that had the benefit of the property taken."

*Monell*, 436 U.S. at 687, 98 S.Ct. at 2034 (emphasis added) (footnotes omitted). After making the foregoing statement, the Court noted that "[i]ndeed the federal courts found no obstacle to awards of damages against municipalities for common-law takings. *See Sumner v. Philadelphia*, 23 F.Cas. 392 (No. 13,611) (CC ED Pa.1873) (awarding damages of $2,273.36 and costs of $346.35 against the city of Philadelphia)." *Monell*, 436 U.S. at 687 n.47, 98 S.Ct. at 2034 n.47.

Finally, we are reassured in the correctness of our decision here—*i. e.* to deny the city immunity from a damage remedy for its uncompensated takings of private property through a zoning law that denies the owner of certain property any economically

---

i. e. the taking of property without compensation, may be maintained against the state, without the necessity of consent by the legislature); *Pelt v. Louisiana State Live Stock Sanitary Board*, 178 So. 644, 647 (La.App.1938) (holding that, since the Louisiana constitutional provision preventing the taking of private property for public purposes without adequate compensation is self-executing, "an agency or political sub-division of the State which has taken or damaged private property for public purposes without paying adequate compensation may be sued therefore, irrespective of the existence or non-existence of legislative authorization for the suit").

**20.** Our refusal to bestow an absolute immunity from damages on the city for its uncompensated takings that result from the application of its zoning ordinances, the effect of which is to deny certain property owners any economically viable use of their land, is reinforced by the

Supreme Court's discussion of the general rules governing a municipality's tort liability in damages in *Owen*. There, the Court wrote: "Under this general theory of liability, a municipality was deemed responsible for any private losses generated through a wide variety of its operations and functions, from personal injuries due to its defective sewers, thoroughfares, and public utilities, to property damage caused by its trespasses and *uncompensated takings*." *Owen*, 445 U.S. at 640, 100 S.Ct. at 1410 (emphasis added).

**21.** Representative Bingham was the author of § 1 of the fourteenth amendment. *See Monell*, 436 U.S. at 685 n.45, 98 S.Ct. at 2033 n.45.

**22.** *See* Cong. Globe App., 42d Cong., 1st Sess. 85 (1871) (remarks of Rep. Bingham), *quoted in Monell*, 436 U.S. at 685 n.45, 98 S.Ct. at 2033 n.45.

viable use thereof—by Justice Brennan's most recent writing on this subject in *San Diego Gas & Electric Co. v. City of San Diego*, —— U.S. ——, ——, 101 S.Ct. 1287, 1295, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting).

In *San Diego Gas & Electric*, the city down-zoned some of plaintiff's property from industrial to agricultural and also designated some 233 acres of plaintiff's land as open space.[23] The plaintiff filed suit in state court alleging a "taking" of its property by "inverse condemnation"[24] and sought compensation. The trial court found a taking without just compensation, and the intermediate appellate court affirmed, holding "there was 'substantial evidence to support the court's conclusion [that] there was inverse condemnation.'" *San Diego Gas & Electric*, —— U.S. at ——, 101 S.Ct. at 1295 (citation omitted) (brackets in original).

The California Supreme Court, however, remanded the case for reconsideration in light of *Agins v. City of Tiburon*, 24 Cal.3d 266, 157 Cal.Rptr. 352, 598 P.2d 25 (1979), *aff'd on other grounds*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), which held that a land owner may not sue in inverse condemnation for compensation and that his sole remedies for such a taking are mandamus and declaratory relief. On remand, the intermediate appellate court reversed the trial court, holding that, unlike a person whose property is taken in eminent domain, one who is deprived of property through the exercise of a municipality's zoning power is not entitled to compensation.

The United States Supreme Court dismissed the appeal for lack of a final judgment because, although the California appellate court "has decided that monetary compensation is not an appropriate remedy for any taking of appellant's property that may have occurred, ... it has not decided whether any other remedy is available because it has not decided whether any taking has in fact occurred." —— U.S. at ——, 101 S.Ct. at 1294. Justice Brennan disagreed with the majority, concluding that the California appellate court's judgment was final because in his view it held as a matter of law on remand that there was no "taking." He and three other Justices[25] dissented from the dismissal and reached the merits.

In discussing the merits, Justice Brennan first opined in accordance with *Agins v. City of Tiburon*, 447 U.S. at 260, 100 S.Ct. at 2141, and *Penn Central Transportation Co. v. City of New York*, 438 U.S. at 138 n.36, 98 S.Ct. at 2666 n.36, that property may be "taken for public use" within the meaning of the just compensation clause by police power regulations such as zoning ordinances and other land use restrictions. —— U.S. at ——, 101 S.Ct. at 1303. Then turning to the primary issue of the case, Justice Brennan, the author of the Court's

---

**23.** Pursuant to the "open space" designation, the city "prepared a report mapping appellant's property for purchase by the city for open space use, contingent on passage of a bond issue." *San Diego Gas & Electric*, —— U.S. at ——, 101 S.Ct. at 1295.

**24.** For a good definitional discussion of inverse condemnation, *see United States v. Clarke*, 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980) (per Rehnquist, J.). In *Clarke*, the Court wrote:

"The phrase 'inverse condemnation' appears to be one that was coined simply as a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted. 'Inverse condemnation is "*a cause of action against a governmental defendant* to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency."' ... A landowner is entitled to bring such an action as a result of 'the self-executing character of the constitutional provision with respect to compensation ...' ... A condemnation proceeding, by contrast, typically involves an action by the condemnor to effect a taking and acquire title. The phrase 'inverse condemnation,' as a common understanding of that phrase would suggest, simply describes an action that is the 'inverse' or 'reverse' of a condemnation proceeding."

*Id.* (emphasis in original) (citations omitted).

**25.** Justice Brennan was joined by Justices Stewart, Marshall, and Powell.

opinions in *Monell* and *Owen*, concluded that "once a court finds that a police power regulation has effected a 'taking,' the government entity must pay just compensation for the period commencing on the date the regulation first effected the 'taking' and ending on the date the government entity chooses to rescind or otherwise amend the regulation." *Id.* —— U.S. at ——, 101 S.Ct. at 1307.

■ Although *San Diego Gas & Electric* was a suit under state law, which was appealed to the Supreme Court, as were *Agins* and *Penn Central Transportation Co.*, Justice Brennan's reasoning therein is applicable with equal force to the § 1983 case before us. Section 1983 provides that "every person," including a municipality, *see Monell*, 436 U.S. at 700–01, 98 S.Ct. at 2040–41, "who under color of any ... ordinance ... subjects ... any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights ... secured by the Constitution ..., shall be liable to the party injured in an action at law ...." 42 U.S.C. § 1983. Since the just compensation clause applies to the states through the due process clause of the fourteenth amendment, *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, —— U.S. ——, ——, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980); *Chicago, B. & Q. R. Co. v. City of Chicago*, 166 U.S. 226, 239, 17 S.Ct. 581, 585, 41 L.Ed. 979 (1897), an action for damages will lie under § 1983 in favor of any person whose property is taken for public use without just compensation by a municipality through a zoning regulation that denies the owner any economically viable use thereof. The measure of damages in such a case will be an amount equal to just compensation for the value of the property during the period of the taking.[26]

### Conclusion

Based on the foregoing, and since there are genuine issues of material fact as to whether the R1–A zoning classification denied plaintiff any viable economic use of his property, we hold that rendition of summary judgment in the city's favor was improper and that the plaintiff is entitled to pursue his claim for damages in an amount equal to just compensation for the value of the property during the period of the "taking."

■ However, in cases such as the one before us, where the application of a general zoning ordinance to a particular person's property does not initially deny the owner an economically viable use of his land, but thereafter does come to result in such a denial due to changing circumstances, or where a zoning classification initially denies a property owner an economically viable use of his land, but the owner delays or fails to timely seek relief from such a classification,[27] we conclude that a "taking" does not occur until the municipality's governing body is given a realistic opportunity and reasonable time within which to review its zoning legislation vis-a-vis the particular property and to correct the inequity.[28]

---

**26.** If a police power zoning regulation is not enacted in furtherance of the public health, safety, morals, or general welfare, there may be no "public use." Although a municipality in such a case may not be compelled to pay just compensation under the Fifth Amendment because there has been no "taking for public use," the landowner whose property is thus "taken"—albeit not for "public use"—will nevertheless have a damage cause of action under § 1983 since such a "taking" would constitute the deprivation of property without due process of law under the Fourteenth Amendment. *See San Diego Gas & Electric*, —— U.S. at ——, 101 S.Ct. at 1305 (Brennan, J., dissenting).

**27.** This would be accomplished either by petitioning the city council or other appropriate body for a rezoning of the property that would allow the owner an economically viable use thereof, or by contesting the initial general zoning regulation prior to its passage.

**28.** We believe that such a rule is consistent with the "weight of authority ... that in order to constitute a taking, the condemnor must have an intention to appropriate ...." *Porter v. United States*, 473 F.2d 1329, 1336 (5th Cir. 1973). *Accord, J. J. Henry Co. v. United States*, 411 F.2d 1246, 1249 (Ct.Cl.1969). The City of Lafayette under the circumstances of this case would lack an intention to deny plaintiff an economically viable use of his property until it was put on notice that its zoning regula-

During the pendency of such proceedings to review and correct a zoning classification that denies an owner any economically viable use of his property, "[m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.'" *Agins v. City of Tiburon*, 447 U.S. at 262–63 n.9, 100 S.Ct. at 2142–43 n.9 (quoting *Danforth v. United States*, 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed.2d 240 (1939)). *Accord, Thomas W. Garland, Inc. v. City of St. Louis*, 596 F.2d 784, 787 (8th Cir.), *cert. denied*, 444 U.S. 899, 100 S.Ct. 208, 62 L.Ed.2d 135 (1979); *Reservation Eleven Associates v. District of Columbia*, 420 F.2d 153, 157 (D.C. Cir. 1969).

The judgment of dismissal of the suit against the mayor is affirmed; the judgment in favor of the City of Lafayette is reversed, and the cause is remanded.

AFFIRMED in part, and REVERSED and REMANDED in part.

tions were effecting such a denial. *But see San Diego Gas & Electric Co. v. City of San Diego*, —— U.S. at ——, 101 S.Ct. at 1303 (Brennan, J., dissenting).