Robert M. COUF, Mary A. Brown, and
Development Finance, Inc.,
Plaintiffs-Appellants,

v.

Karleen DeBLAKER, et al.,
Defendants-Appellees.

No. 79–3229.

United States Court of Appeals,
Fifth Circuit.
Unit B

Aug. 7, 1981.

Jack F. White, Jr., St. Petersburg, Fla., for Brown.

Michael L. Kinney, Tampa, Fla., for Development Finance, Inc.

Harrison, Greene, Mann, Davenport, Rowe & Stanton, Oscar Blasingame, Stephen C. Chumbris, St. Petersburg, Fla., for defendants-appellees.

Before GODBOLD, Chief Judge, MORGAN and HENDERSON, Circuit Judges.

HENDERSON, Circuit Judge:

The plaintiffs appeal from the entry of a judgment notwithstanding the verdict in favor of the defendants. The suit had its genesis in a Florida zoning dispute, but beyond that there is little agreement among the parties and the issues presented are not clearly delineated. Consequently, it is necessary at the outset to briefly summarize the underlying facts and the history of the litigation.

In 1972 the city of Clearwater, Florida adopted a comprehensive land use plan to guide the long-term growth of the city. Subsequently Pinellas County, in which Clearwater is located, formulated a county-wide plan which was approved by the city in May of 1973 and became effective in January of 1974. The county plan envisioned that future residential development would be limited to no more than thirty dwelling units per acre, except in a core central business district.

On April 30, 1973, Development Finance, Inc. (hereinafter referred to as "DFI") purchased a piece of waterfront property on Turner Street in Clearwater (hereinafter referred to as "the Turner lot"). The parcel was zoned for high density residential use, which meant that it would support up to fifty-four units per acre, assuming the availability of sufficient parking and other amenities. DFI proposed to build twenty-five condominiums in a fifteen or sixteen story building, and proceeded to the point of securing a building permit.

DFI was unable to obtain construction financing, however. Believing that a larger project would be more attractive, Robert Couf, DFI's president and sole shareholder, decided to expand and build seventy-four condominiums. The larger building would have required more ground space, so Couf agreed to buy an adjoining lot, carrying the same zoning classification, from Mary Brown (hereinafter referred to as "the Brown lot").

Late in May of 1974, Couf, who did not know of the new county land use plan, made an appointment to discuss his venture with Paul Bergmann, the City Planning Director. Unfortunately for Couf, on June 6, 1974, before the scheduled meeting, the City Commission of the City of Clearwater (hereinafter referred to as the "City Commission") instructed the Planning Department to recommend that all property within 500 feet of the City's waterfront be "downzoned"[1] and to refuse to accept any applications for building permits until after making its recommendation.[2]

On June 10, 1974, Bergmann met with Couf and told him of the permit moratorium. Despite numerous conferences with Bergmann and Mayor Hougen, Couf was unable to procure a permit. At the City Commission's July 1, 1974 meeting the City

---

1. Although not defined in this record or in Webster's New Third International Dictionary we understand this term, in the context of this case, to mean the reduction of the number of building units which may be constructed in a given area.

2. Applications pending on June 6, 1974, were not affected.

Manager recommended that the Turner and Brown lots be downzoned to the medium density residential classification (*i. e.*, twenty-four units per acre) in view of the pending review of the entire waterfront. Couf spoke at the meeting, but the City Commission nonetheless ordered the Planning Department to move forward on the City Manager's recommendation and prohibited it from accepting applications for building permits.[3]

On July 19, 1974, Couf, Brown and DFI filed this action in the federal district court, seeking damages pursuant to the provisions of 42 U.S.C.A. §§ 1983, 1985 and 1986. The plaintiffs' theory of recovery developed over the course of the trial, *cf.* F.R.Civ.P. 15(b) (amendment to conform to evidence), and appears to focus on the charge that the defendants, who are four city commissioners, the mayor, the city manager and the planning and building directors, but not the city itself, deprived them of their property without due process of law.[4]

Then, on July 31, 1974, Couf and Brown filed a petition for mandamus in the Circuit Court of the State of Florida for Pinellas County to require the city to issue a building permit. On September 27, 1974, the court issued a writ of mandamus directing the city and its officials to accept a building permit application for consideration under the existing zoning classification (*i. e.*, fifty-four units per acre).[5] The final order granted Couf thirty days to submit his application for the permit.

Because it was clear in June that an application would have been rejected, the state court excused Couf's failure to then file for a permit. The court's order noted that "[t]he apparent intent, purpose and design of the City of Clearwater to 'down zone' the property in question ... is to be praised," Order at 5–6, but held that because the plaintiffs had "substantially altered their position in reliance upon" the availability of a permit under the old zoning classification the city's "legislative representatives" had abused their discretion. Concluding that the constructive application was denied without good legal cause, the court held that the City Commission's decision was arbitrary.

On October 25, 1974, twenty-eight days after the writ issued, the city and the other defendants appealed, thereby superseding operation of the writ, Fla.App.R. 5.12. The order was subsequently affirmed without opinion. *DeBlaker v. Couf*, 319 So.2d 209 (Fla.App. 1975). Couf never applied for a permit as provided for in the state court order, and the project failed to materialize.

In the federal action, Mrs. Brown sought to recover the cost of her state court litigation and damages for the decreased value of her property.[6] Couf sued for his lost profit on the development, as well as his interest in the Turner lot, which he forfeited when the mortgage was eventually foreclosed. *But cf. Southpark Square Ltd. v. City of Jackson*, 565 F.2d 338, 343 (5th Cir. 1977), *cert. denied*, 436 U.S 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978) ("a city would be unduly hamstrung if its permit decision subjected it to potential liability on the basis of financial arrangements independently made by property owners affected by those decisions.").

Although the parties treat this case as involving a change in zoning classification, all the defendants have done before the federal action commenced was communicate their intention to deny a building permit. We are not sure that the denial of a

---

3. Specific findings on this matter were made in the state court proceedings referred to below.

4. The complaint also alleged that the defendants conspired to "impair the obligations of the contract" between Brown and Couf. This contention was not pursued and is not before us.

5. Apparently the city and county comprehensive plans were only guides, *cf. City of Gainesville v. Cone*, 365 So.2d 737 (Fla.App. 1973)

(Gainesville, Fla. plan), and as a result of the state court litigation downzoning was not finalized until March 17, 1975, when the City Commission adopted an ordinance revising the zoning atlas.

6. It appears that the Couf-Brown purchase agreement was contingent on Couf's obtaining a building permit.

building permit can be the predicate for a federal cause of action, *see Southpark Square Ltd.*, but even if it can we agree that it cannot support a recovery in this case. As the district court's final ordered stated,

> Assuming that some duty owed to the Plaintiffs was breached by Defendants under state law, federal law or the United States Constitution, that breach was fully remedied by the immediate state court order which enjoined Defendants to accept and consider Plaintiffs' application for a building permit under the existing ... zoning classification. At that point Plaintiffs had been granted all the relief to which they were entitled.

Order at 6.

On the other hand, when downzoning finally came, it had a more lasting effect on the plaintiffs and their property. Throughout this appeal the plaintiffs seem to suggest that downzoning was accomplished with the actions the defendants took in the summer of 1974, although as we have noted the necessary ordinance was not enacted until well after this suit was initiated, note 5, *supra*. This lack of precision is unfortunate, but whenever it actually happened, the zoning change cannot support recovery any more than did the permit denial.

Unless an ordinance or classification has the purpose or effect of injuring a protected group or restricting a protected activity, the Constitution places very few substantive limitations on local zoning. *Cf. Schad v. Borough of Mount Ephraim*, —— U.S. ——, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (exotic dancing); *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (family living). Such regulation must be sustained "if it is rationally related to legitimate state concerns and does not deprive the owner of economically viable use of his property." *Schad*, —— U.S. at ——, 101 S.Ct. at 2182; *see Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).[7]

> [L]ocal zoning is a quasi-legislative procedure, not subject to federal juridicial consideration in the absence of arbitrary action.
>
> . . . .
>
> ... A zoning commission is a quasi-legislative body. It is not required to make findings of fact or state the reasons for the action taken. Its actions are entitled to a presumption of validity. The only question which federal district courts may consider is whether the action of the zoning commission is arbitrary and capricious, having no substantial relation to the general welfare.

*South Gwinnett Venture v. Pruitt*, 491 F.2d 5, 7 (5th Cir.) (en banc), *cert. denied*, 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974). The power to channel growth through zoning is "one of the firmest and most basic of the rights of local control." *Stansberry v. Holmes*, 613 F.2d 1285, 1288 (5th Cir.), *cert. denied*, 449 U.S. 886, 101 S.Ct. 240, 66 L.Ed.2d 112 (1980), and where a community expresses that power as part of "a rational and understandable effort to deal with a perceived evil," *id.* at 1289, a federal challenge cannot be sustained in the district court. *Id.; Blackman v. City of Big Sandy*, 507 F.2d 935 (5th Cir. 1975); *South Gwinnett Venture; cf. Developments in the Law—Zoning*, 91 Harv.L.Rev. 1427, 1443–62, 1550–78 (1978) (substantive limitations on zoning). *See generally* L. Tribe, *American Constitutional Law*, §§ 8–7, 16–3 (1978). Certainly, the protection of the city shoreline was of critical importance to the City Commissioners. Whether they chose the best way to regulate development is not for us to decide, for that judgment was their prerogative. *Zahn v. Board of Public Works*, 274 U.S. 325, 328, 47 S.Ct. 594, 595, 71 L.Ed. 1074, 1076 (1927); *Stansberry*, 613 F.2d at 1289; *Blackman*, 507 F.2d at 936.

The plaintiffs have not explained why the downzoning is not rationally relat-

---

7. The constitutional source of this protection can be the equal protection clause, *Village of Belle Terre v. Boraas*, 416 U.S. 1, 8, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797, 803 (1974), the due process and just compensation clauses, *Moore*,

431 U.S. at 514, 97 S.Ct. at 1943, 52 L.Ed.2d at 546, or perhaps all three, Monaghan, *Of "Liberty" and "Property"*, 62 Cornell L.Rev. 405, 405–06 (1977).

ed to the city's interests. Instead, they argue that the state courts found the action arbitrary and irrational, and that this finding was binding in the federal litigation.[8] This reasoning is sound to a point, for it is obvious that a state court determination of a federal issue, when made after a full and fair hearing, controls in a subsequent § 1983 action in a federal forum. *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). *See generally, Developments in the Law—Section 1983 and Federalism,* 90 Harv.L.Rev. 1133, 1330–54 (1977).[9] But, as the district court recognized in granting the judgment *n. o. v.,* the state courts never found the City Commission's actions to be arbitrary in the sense relevant to this case. It is true that state trial judge said that downzoning "cannot be *arbitrarily* and confiscatorily imposed upon the Plaintiffs by the simple means of verbal directives . . . ." Order at 6–7 (emphasis supplied). But it is abundantly clear that he meant that the City Commission had violated state procedural rules. It is impossible to read the order as holding that the zoning classification was irrational. In fact, it says just the opposite.[10] As the district court saw it, entirely different issues were involved in the state and federal actions. The inflections of the word "arbitrary" used in the state and federal court opinions may be a bit confusing, but are not controlling.

The second relevant substantive restriction on the zoning power is the fifth amendment's injunction against taking private property for public use without just compensation. It is not certain that the plaintiffs meant to ground their complaint on this amendment to the Constitution, but their presentation has been far from clear and their complaint can be read as taking that stance. Leaving aside the substantial issue of the immunity of individual defendants from liability for a taking, *see Hernandez v. City of Lafayette,* 643 F.2d 1188 (5th Cir. 1981), *reh. denied,* 649 F.2d 336 (5th Cir. 1981), we are satisfied that even if the plaintiffs properly asserted the claim they were not entitled to recover on it. The record is devoid of any evidence that the city's action had so great an impact on the value of the plaintiffs' property as to constitute a compensable taking. *See Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Hernandez.*

Having concluded that the City Commission's eventual classification was free of substantive fault, we next examine the procedures followed in making that decision.

The first section of the fourteenth amendment provides, in pertinent part, that "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." The accepted understanding of this section has, to say the least, evolved considerably in the past few years. *See generally,* K. Davis, 2 *Administrative Law Treatise* §§ 11:1–:3 (2d ed. 1979); L. Tribe, *American Constitutional Law* § 10–12 (1978); Monaghan, *Of "Liberty" and "Property",* 62 Cornell L.Rev. 405 (1977); Van Alstyne, *Cracks in "The New Property",* 62 Cornell L.Rev. 445, 457–70 (1977). For our purposes it is enough to say that we

---

8. Although the state mandamus proceeding began after the federal action commenced, it was completed long before the federal case went to the jury.

9. An interesting question is whether the defendants would have been entitled to summary judgment in view of the plaintiffs' failure to raise these claims in state court. *See Allen* at notes 5 and 10; *cf. Southpark Square Ltd.* (relevance of state remedies). We have no occasion to reach this problem because the defendants failed to affirmatively plead this defense, if it is a defense, as required by F.R. Civ.P. 8(c).

10. *See e. g.,* Order at 5 ("Any action by public officials to terminate the proliferation of man made mountains of concrete, glass and steel, along our shore lines is to be commended."), 5–6 ("The apparent intent, purpose and design of the City of Clearwater . . . is to be praised.") and 6 ("It would appear that the Defendants on some recent one day past, took startled note of Clearwater's downtown bay front and suddenly decided that enough was enough. We wish it could be so.").

must investigate whether any constitutionally protected interests were at stake, and if there were, what procedural safeguards the City Commission was required to observe in making decisions affecting those interests. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *compare Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), *with Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see* K. Davis, *supra*, § 11:1 at 341–43, § 11:3 at 349; L. Tribe, *supra*, § 10–12 at 533ff. Here, the protected interest was real estate.

■ Our en banc opinion in *South Gwinnett Venture* explicitly holds that "The *only* question which federal district courts may consider is whether the action of the zoning commission is arbitrary and capricious, having no substantial relation to the general welfare." 491 F.2d at 7 (emphasis supplied). The only conclusion we can draw from this statement is that federal review of zoning disputes should be limited to a single issue. In that respect, as stated earlier, this action was not substantively invalid.

Our opinions repeatedly characterize local zoning decisions as "legislative" in nature. *Hernandez; South Gwinnett Venture; Higginbotham v. Barrett*, 473 F.2d 745, 747 (5th Cir. 1973). If this word is used advisedly—as it appears to be—then the plaintiffs cannot complain of a denial of procedural due process, for no constitutional limitation on legislative procedure is relevant here. *See Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372, 375 (1915), discussed

in K. Davis, *supra*, § 12:2 at 412; *cf. City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976) (referendum). *See generally* L. Tribe, *supra*, § 10–7 at 502 and note 4; *Developments in the Law—Zoning*, 91 Harv.L.Rev. 1427, 1508–13 (1978). Most of the cases developing procedural limitations on government action involve challenges to administrative decisions. The plaintiffs do not cite a single federal case that even discusses procedural requirements for zoning matters, let alone one that reverses a zoning decision because of a procedural failure. *See Developments in the Law—Zoning*, 91 Harv.L.Rev. 1427, 1502–49 (extensive discussion of cases).

At least one case decided after *South Gwinnett Venture* suggests that the fairness of the procedures by which a zoning classification is made—as opposed to the propriety of the classification itself—is a subject fit for review in the federal courts. *Stansberry*, 613 F.2d at 1289 and note 9. There is no necessity to determine whether this judicial expression flies in the face of *South Gwinnett Venture*, however, because the plaintiffs did not produce any evidence of procedural infirmities.

■ Only two allegations of procedural flaws can be discerned from even the most dedicated and sympathetic examination of the pleadings and record.[11] First, that one commissioner had a pecuniary interest in the zoning decision, and, second, that the City Commission acted out of malice toward Couf. The only evidence cited by the appellants to support the charges is that Commissioner Williams once attempted to buy the Turner lot from Couf. We have studied the record, and there is no more. Even if

---

11. The plaintiffs seem to urge that the defendants' violation of Florida administrative law provides a predicate for § 1983 recovery. The state court litigation established such a violation, but not every infraction of state law constitutes interference with a constitutionally protected interest. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Specifically, "although a Due Process Clause liberty interest may be grounded in state law that places substantive limits on the authority of state officials, no comparable entitlement can

derive from a statute that merely establishes procedural requirements." *Cofone v. Manson*, 594 F.2d 934, 938 (2d Cir. 1979); *accord, Bills v. Henderson*, 631 F.2d 1287, 1298 (6th Cir. 1980). This procedure-substance distinction was made in *Bishop v. Wood*, 426 U.S. 341, 345, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684, 690 (1976), but it is not certain what significance the Court attached to it. See discussion in Monaghan, *Of "Liberty" and "Property"*, 62 Cornell L.Rev. 405, 439–40 (1977).

we assumed that a federal cause of action could be based on proof of bad faith and that the question of the motivation of the defendants was one for the fact finder, there simply is not enough evidence to create a jury issue, *Boeing Co. v. Shipman*, 411 F.2d 365, 373–77 (5th Cir. 1969) (en banc). It follows from the foregoing that the district court was correct in granting the defendants' motion for judgment notwithstanding the verdict.

AFFIRMED.