AFFILIATED CAPITAL CORPORA-
TION, Etc., Plaintiff-Appellant,

v.

CITY OF HOUSTON, et al., Defendants,

Gulf Coast Cable Television and James
J. McConn, Defendants-Appellees.

No. 81–2335.

United States Court of Appeals,
Fifth Circuit.

July 16, 1984.

Rehearing Denied Sept. 17, 1984.

Stephen D. Susman, William H. White, Charles J. Brink, Houston, Tex., Michael M. Barron, Austin, Tex., for plaintiff-appellant.

Rufus Wallingford, Houston, Tex., for City of Houston and Jim McConn.

John L. Jeffers, Richard B. Miller, Houston, Tex., for Gulf Coast Cable.

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, GARZA *, REAVLEY, POLITZ, TATE, JOHNSON, WILLIAMS, JOLLY, HIGGINBOTHAM and DAVIS, Circuit Judges.**

GARZA, Circuit Judge:

In *Affiliated Capital Corp. v. City of Houston*, 519 F.Supp. 991 (S.D.Tex.1981), the district court granted the defendant's judgment n.o.v. motion in an antitrust action because it believed there was insufficient evidence connecting plaintiff's theory of conspiracy to limit competition and its failure to receive a cable television franchise. A divided panel of this court reversed that decision holding among other things that the conspiracy complained of was a *per se* antitrust violation. *Affiliated Capital Corp. v. City of Houston*, 700 F.2d 226 (5th Cir.1983). We vacated that decision and decided to hear this case *en banc*, 714 F.2d 25 (5th Cir.1983). Because the

---

* Judge Garza, now a senior judge of this circuit, is participating as a member of the panel that initially considered the appeal now subject to *en banc* review.

** Judges Randall and Garwood did not participate in this decision.

district court's j.n.o.v. ruling can be reversed without reaching the issue of a *per se* violation, we again reverse the court below, and reinstate the jury verdict. The City of Houston is not a party to this appeal, having been voluntarily dismissed by the plaintiff on June 23, 1982.

## I.

### FACTS

The events leading to the litigation at bar commenced in 1972, when several firms sought cable television franchises from the city of Houston. After reviewing these applications the Houston Public Service and Legal Departments recommended two firms to the Mayor and City Council. The Mayor and City Council then awarded one corporation a franchise for the entire city. The unsuccessful franchise applicant, Gulf Coast Cable Television Co. [hereinafter Gulf Coast] then secured a petition of more than five hundred Houston voters calling for a referendum on the Council action.[1] The voters soundly defeated the grant of a monopoly franchise.

In 1978 the city was again considering granting cable franchises. Mayor McConn, who had been a city councilman in 1973, wanted a plan that would not be overturned by the voters. The Mayor testified at the trial below that he, therefore, determined that several franchises would be granted. In addition, he decided that qualified, local applicants would be favored. Finally, he concluded that any plan should include minority participation. Defendant Gulf Coast was the first of many concerns to seek a cable television franchise in 1978.[2] There is ample evidence that the city of Houston did not even initiate the franchise process; defendant Gulf Coast approached the city and made application for a franchise. The city of Houston is a highly desirable cable television market. The city, however, made no effort to take advantage of its position by publicizing its intention to award franchises. Instead of following this common practice, the city passively accepted applications as they arrived. From the many applications submitted to the Public Service Department, four emerged as strong contenders. Their strength was not based on the merits of their proposals, however, but on the political power of the men behind them. These four actors were Gulf Coast, Houston Cable Television Co., Houston Community Cable Television Co., and Meca. Mayor McConn had let it be known that he did not want to choose between competing applicants. He wanted the applicants to cooperate, resolve any overlaps in their territories and present him with a finished product. He abdicated his responsibility in the franchising process to a group of powerful Houston businessmen. In turn, these businessmen became friendly competitors in an effort to divide the city among themselves and prevent competition from any outsiders.

These businessmen and their attorneys met, and over a period of time mutually agreed on franchise areas. After this agreement, the Mayor informed Gulf Coast that another applicant, Westland Corporation, a group primarily controlled by the Mayor's personal attorney, had to be added to the ranks. A portion of the area Westland desired was in the territory sought by Gulf Coast. Conscious of both the political realities of the situation and the need to avoid competition among potential franchises, Gulf Coast decided to redraw the franchise boundaries in order to comply with McConn's wishes. After this arrangement was completed the businessmen were ready to present proposed franchises to the Mayor and City Council for approval.

While Gulf Coast and the above-mentioned applicants were cutting out competition by carving up the city amongst themselves, the plaintiff, Affiliated Capital Cor-

---

1. Tex.Rev.Civ.Stat.Ann. art. 1181 (Vernon 1963) and the Charter of the city of Houston provided for this procedure.

2. Gulf Coast is a limited partnership that operates solely in the cable television business. Af-

ter its unsuccessful bid for a franchise in the city of Houston in 1972, Gulf Coast remained in business and obtained franchises for a number of small cities within the Houston Metropolitan area.

poration, [hereinafter Affiliated] entered the picture. Affiliated is a publicly-held corporation that owned a savings and loan association. A federal prohibition against owning both a savings and loan association and a cable television system prevented Affiliated from making application for a franchise until it sold the savings and loan association. After the mid-September sale, Affiliated hired a local attorney to investigate the state of the franchising process. When the attorney contacted counsel for Gulf Coast, he was informed that Affiliated was too late because the "pie had been cut." Surprised by this news, Affiliated's president, Billy Goldberg, went to visit the Mayor who assured him that there was still time for Affiliated to receive a fair hearing. Consequently, Affiliated made application for a cable television franchise on October 16th.

Although the city never advertised its intention to award cable television franchises, it did undertake other measures calculated to give the appearance that the citizens of Houston would receive quality cable television service. The Public Service Department prepared a questionnaire, which was distributed to all franchise applicants. The city hired a consultant, Dr. Robert Sadowski, to evaluate the applicants based on their responses to this questionnaire. By the middle of November, Dr. Sadowski had completed a report that was highly critical of the franchising/selection process. He warned that it was irrational to allow the applicants themselves to divide the city into franchise territories. He concluded that such a procedure did not give the citizens of Houston the best possible cable television service.

In addition to this general indictment of the process, Dr. Sadowski recommended that only two of the applicants, Meca and Cable-Conn, be awarded the franchise ar-

eas they sought.[3] He urged that three applicants, Houston Cable, Westland, and Houston Community Cable, be rejected and that the size of defendant Gulf Coast's service area be reduced substantially. He apparently had doubts about the ability of Gulf Coast to service even this smaller territory so personally inspected its facility. Shortly after this visit, Sadowski was fired. His conclusions were altered before the report was publicized. The five ultimately successful applicants were pronounced qualified.[4]

The City Council then began taking final action on the franchise applications. The president of Affiliated appeared before City Council and requested that his application be given due consideration. Instead of due consideration, the City Council (through Councilman Johnny Goyen) admonished Affiliated to go and work out an agreement with the defendant and the other above-mentioned applicants. Goyen said:

Mr. Goldberg, let me address Council's wisdom. As these applications came in, they were sent to the Legal Department. Obviously, a number of lawyers got together and did whatever they did. I was not privy to it nor did I want to sit in on any meeting.

Apparently, they came up with the formula that those applicants agreed upon. I was hoping that your situation might end up in the same pot as the others, whereby there would be some kind of recommendation coming before this Council, and this Council would not have to carve from one to give to another which we have not had to do in the past and which I do not want to do now nor do I intend to.

I do not want to taketh away and giveth to somebody else, because I

---

3. Doctor Sadowski never evaluated Affiliated's application because it was submitted after his employment had been terminated.

4. Shortly before the City Council considered the franchise ordinances, the Public Service Director submitted a letter to the City Attorney to the effect that he lacked the information necessary to judge the merits of each application. In

relevant part, the letter concluded that "[w]hile these issues may have been considered by the drafting principals, and may have been addressed satisfactorily by them, I have no way of knowing this." Record on Appeal, vol. 14, at 616. The "drafting principals" were later identified as the attorneys for certain franchise applicants.

haven't had to do that in the past. You have a very competent attorney, and the other people have very competent attorneys. What I would like to see done, and it might take a motion to get this done, is to send this to the Legal Department and try to work something out.

Plaintiff's Exhibit 150, at 27–28.

The message to Goldberg was clear: it was not the Council, but rather private businessmen who would decide the future of cable television in Houston. When Mr. Goldberg did not make an agreement with those businessmen, the City Council and Mayor voted for the convenient franchise package presented by Gulf Coast and the other conspirators.

Affiliated then filed this suit alleging that defendants had engaged in a conspiracy to prohibit its entry into the Houston cable television market, thereby violating section 1 of the Sherman Act. Specifically, the plaintiff claimed that certain applicants for cable television franchises agreed to define the territories in which they would apply for franchises, so that no two members of the conspiracy would compete for the same territory. In addition, plaintiff charged defendants with participation in a more general conspiracy to limit competition for cable television franchises by excluding non-conspirator competitors.

## II.

### DISTRICT COURT JUDGMENT

At the close of evidence in the trial of the instant case, the jury was presented with a series of interrogatories. The relevant interrogatories and jury responses are reproduced below.

### INTERROGATORY NO. 1

It is established that two or more franchise applicants, including defendant Gulf Coast, participated in agreements on boundary lines so as to divide the geographic areas for which these applicants would seek cable television franchises. Do you find from a preponderance of the credible evidence that these arrangements were part of a conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act. Answer "yes" or "no."

ANSWER: No.

### INTERROGATORY NO. 3

Do you find from a preponderance of the credible evidence that one or more of the defendants participated in a conspiracy in unreasonable restraint of trade to limit competition for cable television franchises, in violation of Section 1 of the Sherman Act? Answer "yes" or "no."

ANSWER: Yes.

### INTERROGATORY NO. 4

Do you find from a preponderance of the credible evidence that any of the following persons participated in that conspiracy? Answer "yes" or "no."

a. City of Houston
 Yes

b. Mayor Jim McConn
 Yes

c. Gulf Coast Cable Television
 Yes

### INTERROGATORY NO. 5

Do you find from a preponderance of the credible evidence that either of the conspiracies, if you have so found in answer to Interrogatories 1 or 3, proximately caused injury to the plaintiff's business or property? Answer "yes" or "no."

ANSWER: Yes.

### INTERROGATORY NO. 6

What sum of money, if paid now in cash, do you find from a preponderance of the credible evidence would fairly and reasonably compensate plaintiff for the damages, if any, you find plaintiff has incurred? Answer in dollars and cents, if any.

ANSWER: $2,100,000.00.

In a post-trial motion, defendants argued for judgment notwithstanding the verdict on three grounds. First, the defendants asserted that all of plaintiff's evidence had related to boundary agreements, found legal by the jury's answer to Interrogatory No. 1, so that there was no evidence to support the jury's finding of an independent conspiracy under Interrogatory No. 3. Second, they claimed that there was no evidence exclusive of boundary agreements

to support the proximate cause finding in Interrogatory No. 5. Finally, defendants contended that the *Noerr-Pennington* doctrine mandated judgment notwithstanding the verdict.

In a thorough and carefully researched opinion, *Affiliated Capital Corp. v. City of Houston*, 519 F.Supp. 991 (S.D.Tex.1981), the district court granted the relief requested by the defendants. Although the trial judge found substantial evidence independent of the boundary agreements to support the answer to Interrogatory No. 3,[5] he concluded that plaintiff had failed to

5. In response to defendant's motion, plaintiff cited a wealth of evidence to demonstrate a second theory of conspiracy. In its memorandum opinion the court set out all the evidence which it agreed would support a second theory of conspiracy to limit competition:

By late August 1978, Clive Runnells, on behalf of Gulf Coast, had agreed with Meca that they would be friendly competitors. Testimony of Clive Runnells. Al Levin, Affiliated Capital's lawyer during the franchising process, testified that by September 20, 1978, he contacted Bill Chamberlain, an agent of Gulf Coast. Chamberlain told him that Gulf Coast's attorney Bill Olson "was a pushing force of the cable TV situation at that point." Levin further testified that he then contacted Olson and Olson told him, "as far as I am concerned, Al, it's too late; the pie has already been cut." On the day before this telephone conversation between Levin and Olson, Olson had told Jonathan Day, an attorney for Houston Cable, that Olson was "trying to put a map together" and that "most of the areas are defined on eastern side." Plaintiff's exhibit 63.

On September 28, 1978, a lawyer for Houston Cable wrote to the lawyer for Gulf Coast regarding the franchise ordinance:

Enclosed is a copy of the proposed cable television ordinance marked to show deletions and additions, including some recommended by our FCC counsel. Also enclosed is an unmarked copy for your convenience.

The enclosed form of the proposed ordinance has been placed in our word processing equipment. Consequently, any changes or additions you wish to make can be easily accommodated. As we discussed, the enclosed form should be considered as an internal working draft so that we can reach an agreed proposal to present to the city.

Plaintiff's exhibit 14. A week later he wrote another letter recounting that they had met on this franchise ordinance, and noting their discussions of various provisions of this proposed ordinance, including the provision with respect to the percentage of the City's interest in the gross revenues from the ordinances:

Enclosed is a revised form of CATV ordinance with the changes we discussed at our last meeting in Section 8.G; Section 10.B; Section 12.H, J, and M; and Section 23.A.

Also enclosed is a suggested revision to Section 20.A regarding the three percent of gross revenue issue in the event we are unsuccessful in limiting the franchise fee to regular subscriber service.

If you have further comments or suggestions regarding this proposed form of ordinance, please let me know.

Plaintiff's exhibit 15. None of the referenced sections of the proposed ordinance relates to boundaries.

In October 1978, Runnells and others met with Mayor McConn. At that meeting, Runnells was informed that McConn wanted Westland to have a franchise. Westland had applied for a portion of the area sought by Gulf Coast, and the Mayor indicated to Gulf Coast that a general area, Westbury-Meyerland, was what he wanted Westland to have. Testimony of Clive Runnells; Testimony of James McConn.

On November 22, 1978, notice of the November 29th City Council agenda indicated that six (6) ordinances, five of which ultimately were approved, would be considered. On November 27, 1978, the attorney for Houston Cable, one of the applicants scheduled on the upcoming agenda, sent a final proposed cable television ordinance to the City Attorney:

Enclosed is a revised form of the proposed cable t.v. ordinance which includes the modifications made this week-end.

In order to meet the proposed time schedule, any further revisions must be agreed by 12 noon on Tuesday, November 28. Final proofing of the enclosure will be completed by that time.

Plaintiff's exhibit 29. He also sent a copy of the ordinance to Gulf Coast's attorney, who had discussed it with the lead counsel for Houston Cable earlier that morning:

Enclosed is the proposed cable t.v. ordinance which Jonathan Day discussed with you this morning. Also enclosed is a copy of the transmittal letter to the City attorney.

I have marked significant changes in red in order to facilitate your review. If you have any questions or comments, please let me know.

Plaintiff's exhibit 30. The next day Houston Cable's attorney sent copies of the ordinances to the ultimately successful applicants. The proposed ordinances were complete except for the names of the applicants and their proposed service area. Plaintiff's exhibits 32 & 189. The successful applicants then filled in the blanks with their names and service areas, and forwarded the ordinances to the City Attorney. Some applicants sent their proposed ordinances back to the Houston Cable Attorney who then forwarded them to the City. Plaintiff's exhibit 35.

The agenda for the City Council meeting of November 29, 1978 contained six (6) cable television franchises, not including plaintiff's, Plaintiff's exhibit 33; those ordinances had been placed on the agenda on or before November 22, 1978, Plaintiff's exhibit 174. When Affiliated attorney Levin heard of this, he contacted Assistant City Attorney Adrian Baer. Baer relayed the following information to Levin:

[T]he Mayor and City Council had made their decision, and [Baer] said, 'I learned this directly from the Mayor, the franchises are non-exclusive, he does not know about the areas, it's still being worked out by Williams and Baer ... so the net result will be a de facto exclusive.'

He [,Baer,] explained to me that there were—the decisions as to who was going to get what areas, specifically in terms of the actual boundaries, were still under negotiations, but the decision as to who was fait accompli.

Testimony of Al Levin; Plaintiff's exhibit 106.

After an on-site inspection of Gulf Coast's Bellaire facilities, Sadowski, the consultant hired by the City of Houston, told Earle, Director of Public Service, and Baer, Assistant City Attorney, that he would reject Gulf Coast's application. The next morning, Sadowski was fired. One day later a messenger from Earle retrieved the notes Sadowski had made concerning the applications. In his notes, Sadowski had not recommended that Gulf Coast's application be rejected, in spite of his oral suggestion to that effect to Earle and Baer, and he testified that he would have made no substantive changes in his report after the visit to Gulf Coast's facilities. He had recommended in his report, however, that Gulf Coast be given a smaller franchise area than that for which it had applied. When Sadowski's notes were typed by someone with the City, that recommendation was deleted. Moreover, other significant changes were reflected in the typed version of the notes Sadowski had turned over to Earle's messenger: his recommendations that Houston Community Cable, Houston Cable, and Columbia (Westland) be rejected were changed to recommendations that they should continue to be considered; and his statement that Cablecom had presented the only satisfactory application was omitted. Testimony of Robert Sadowski.

Prior to the plaintiff's hearing before City Council on December 12, 1978, McConn suggested to Goldberg that Affiliated seek a franchise in another area of the City rather than in the area sought by Gulf Coast. McConn testified as to his motivation for the suggestion: "I thought that, in trying to really help Mr. Goldberg, it was pretty obvious to me that Gulf Coast had the muscle and that Mr. Goldberg did not."

At the City Council hearing on plaintiff's application which was conducted on December 12, 1978, the following comments were made by Councilman Goyen:

Mr. Goldberg, let me address Council's wisdom. As these applications came in, they were sent to the Legal Department. Obviously, a number of lawyers got together and did whatever they did. I was not privy to it nor did I want to sit in on any meeting.

Apparently, they came up with the formula that those applicants agreed upon. I was hoping that your situation might end up in the same pot as the others, whereby there would be some kind of recommendation coming before this Council, and this Council would not have to carve from one to give to another, which we have not had to do in the past and which I do not want to do now nor do I intend to.

I do not want to taketh away and giveth to somebody else, because I haven't had to do that in the past. You have a very competent attorney, and the other people have very competent attorneys. What I would like to see done, and it might take a motion to get this done, is to send this to the Legal Department and try to work something out.

Plaintiff's exhibit 150, at 27–28. Subsequently, the Council discussed how to proceed with plaintiff's application, and Councilman Mann made the following suggestions:

I want to make a substitute motion that the [plaintiff's] application be referred to the Legal Department, and they in turn can contact these other applicants who have come forward and see if they can work out something.

....

If you take this, fine, then see how much Gulf Coast is going to knock off this other group on farther down and then around and around.

....

Substitute motion that this application be referred to the Legal Department and Public Service, and they are to contact the other people that have ordinances and guarantee that these boundaries are being adjusted between them, and they report back to Council.

Plaintiff's exhibit 150, at 37, 39, 40.

Also at that hearing, Mann indicated his knowledge of a house-count survey that had been conducted by Gulf Coast. Plaintiff's exhibit 150, at 25. The survey resulted in a comparison between the area plaintiff was applying for and an area that was within Houston Cable's application, Plaintiff's exhibit 84, and was conducted in conjunction with a proposal by Gulf Coast, that if Houston Cable would give the identified area to Gulf Coast, then Gulf Coast would be willing to give plaintiff its area. Testimony of Al Levin. A document, prepared sometime between November 28, 1978, and December 20, 1978, by Assistant City Attorney Baer

demonstrate that its injury was caused by anything other than defendants' boundary agreements. Thus, he reasoned that there was no evidence to support Interrogatory No. 5:

> [T]he agreements to allocate and divide territory cannot be considered as evidence proving causation of plaintiff's injury, and no other evidence in the record, either direct or inferential, provides the necessary connection between the second theory of conspiracy to exclude non-conspirators and the plaintiff's failure to receive a franchise.
>
> The testimony elicited by plaintiff from its expert witness further demonstrates that what plaintiff established was a causal relationship between the applicants' agreements to eliminate overlaps in territory and the plaintiff's failure to be awarded a franchise, rather than a relationship between the agreement to

exclude non-conspirators and plaintiff's injury.

519 F.Supp. at 1006.

## III.

## IMPACT ON COMPETITION

It is abundantly clear from the record of this case that a group of Houston businessmen decided to ensure the receipt of cable television franchises by agreeing to divide the city among themselves and exclude anyone who wanted to compete for a franchise on the merits. They did so not simply with the blessing of the Mayor, but at his behest. Record on Appeal, vol. 12, at 450. The devastating competitive impact of this gentlemen's agreement to exclude anyone who wished to compete for a franchise, is evident against the backdrop of the inherent structure of the cable television industry.

bears an alternative boundary description for the Gulf Coast franchise including the Houston Cable area, with Baer's notation: "I–10 line shifted to Hwy. 290 without Goldberg's tract— contingency." Plaintiff's exhibit 56.

The City Council favored Gulf Coast's franchise, which subsumed the area plaintiff had applied for, and at trial several councilmen and Mayor McConn testified as to their reasons therefor. McConn's concern was to keep politically influential groups content:

Q. You didn't want to step on anybody's political toes, did you?

A Not if I could avoid it.

Q You didn't want to make any type of political decision where some powerful person like Walter Mischer would be unhappy, did you?

A Not if I could avoid it.

Q And if all of the parties could work things out, then you wouldn't have to make any type of decision, other than approving their agreements, isn't that correct?

A Yes, generally that is correct, yes, sir.

Q And isn't that what you wanted to happen?

A That would have been beautiful, if it could have happened that way.

Q But when it didn't happen and you had to make the choice between Southwest Houston and Gulf Coast, you stated that the other—you thought the other people were more politically powerful than Southwest, isn't that correct?

A Yes, sir. I don't know if I said that, but I'll say it now. Testimony of James McConn.

Councilman Goyen testified by deposition that he would have voted for Affiliated Capi-

tal's application if "on the 20th, Mr. Goldberg had come in and Mr. Runnels had come in, Mr. Mishcher had come in, and all the principals had come, and a piece of Houston had been carved out for Mr. Goldberg with no objection by anybody." Councilman Robinson testified that he would have supported Affiliated Capital's application if plaintiff had been able to work something out with Gulf Coast to give him what he wanted. Councilman Westmoreland testified that he did not disagree with his prior deposition testimony that Affiliated had been unable to work out any type of arrangement with Gulf Coast, and for that reason Westmoreland voted in favor of Gulf Coast.

Finally, plaintiff's expert witness, Martin Malarkey, testified at length about the detrimental results of the noncompetitive franchising process in Houston, and about the benefits to residents of other cities where the process has involved competition on the merits of the applications. According to his testimony, the benefits include lower rates, provisions for sanctions in the event of noncompliance by the franchisee, provisions for performance bonds, and provisions requiring city approval prior to changes in ownership or control of the franchises. Further, he testified that normally the city itself prepares the franchise ordinance, rather than allowing applicants to do so.

519 F.Supp. at 1000–05 (footnotes omitted).

Cable television, like electric utilities, is generally considered a natural monopoly. According to conventional wisdom, the extremely high fixed costs incurred in preparing a cable television company for operation prevent the survival of competition in the marketplace. Plaintiff's expert witness on the cable television industry admitted that it did not make economic sense to grant franchises with overlapping boundaries. Record on Appeal, vol. 35, at 28. The economies of scale do not approach those of electric utilities but the theory for both industries holds that the long-run average costs tend to fall as output increases. We assume for purposes of this discussion that cable television is indeed a natural monopoly and proceed to discuss the pernicious effects of the conspiracy given this assumption.

Defendant Gulf Coast argues that since cable television is a natural monopoly and competition within franchise areas is impractical, the division of territories is a practical characteristic of this industry and was not harmful to consumers. Given this characteristic, competition is possible only before a franchise is granted. Unfortunately for both Affiliated and the citizens of Houston, there was no competition among the corporations that received franchises. The result was lower quality, higher priced cable television for Houston. Record on Appeal, vol. 34, at 23–27.

## IV.

### THE J.N.O.V. RULING

In *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (*en banc*), this court established the standard of review of a judgment n.o.v. or directed verdict by a trial court. We stated that:

On motions for ... judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reason-

able men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied.

*Id.* at 374–75; *accord Bazile v. Bisso Marine Co.*, 606 F.2d 101, 104 (5th Cir.1979), *cert. denied*, 449 U.S. 829, 101 S.Ct. 94, 66 L.Ed.2d 33 (1980).

In weighing the evidence the jury had at its disposal we find that it amply supports the jury's findings in interrogatories Nos. 3 and 5. In no event is the evidence in favor of the defendant so overwhelming that reasonable men could not arrive at the verdict reached by the jury. Thus, the trial court was incorrect in overturning the jury verdict.

■ In addressing the harm plaintiff suffered as a result of the conspiracy recognized in Interrogatory No. 3, it is important to understand that the agreement to exclude those who wanted to compete constitutes a separate conspiracy and a valid independent ground for imposing liability. While at first glance the answers to Interrogatories Nos. 1 and 3 appear irreconcilable, the explanation is simple. The manner in which Interrogatory No. 1 was posed to the jury caused them to believe that they were passing on the question of whether or not it was better to have one franchise for the city or multiple franchises. All of the parties to the suit agreed that dividing the city into several franchises was preferable and would not unreasonably restrain trade. Indeed, the jury sent a note to the trial judge asking whether or not they needed to answer both questions. They asked: assuming we want to vote "yes on # 3 is there any point in voting on # 1?" Jury Note No. 4, Record on Appeal, vol., 1, at 1482.

■ As noted, the trial court believed that the conspiracy found by the jury (Interrogatory No. 3), was not the proximate cause of plaintiff's failure to receive a fran-

chise. The court thus overturned the jury's answer to Interrogatory No. 5. Before addressing this argument directly, we pause to point out that proof of causation in this case is necessarily hypothetical (what would have occurred in the absence of the conspiracy). As the Supreme Court has noted, "[t]he vagaries of the market place usually deny us sure knowledge of what plaintiff's situation would have been in the absence of defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motor Corp.,* 451 U.S. 557, 567, 101 S.Ct. 1923, 1930, 68 L.Ed.2d 442 (1981). We also note that a plaintiff seeking damages for an antitrust injury need only prove with a fair degree of certainty that the defendant's illegal conduct materially contributed to his injury. *Hayes v. Solomon,* 597 F.2d 958, 978 (5th Cir.1979) *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 20 (5th Cir.), *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974); *Gainsville Utilities Department v. Florida Power & Light Co.,* 573 F.2d 292, 304 (5th Cir.) (noting that a jury charge asking whether or not the violation was a "substantial factor" in plaintiff's loss is a model of perfection), *cert. denied,* 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978). *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969) (in proving fact of damage under § 4 of the Clayton Act it is enough that the violation is shown to be a "material cause" of injury).

■ When the jury considered Interrogatory No. 3., (which asked whether the defendants conspired to limit competition for cable television franchises), they found that the agreement did constitute an unreasonable restraint of trade. The trial court mistakenly assumed that in determining proximate cause the jury improperly considered evidence pertaining to the boundary agreements submitted in Interrogatory No. 1 and that the evidence plaintiff cites in support of Interrogatory No. 5 is inappropriate because it concerns evidence relating solely to Interrogatory No. 1.

Despite the learned trial court's opinion we find that the judgment n.o.v. was improper because there is substantial evidence and inferences to support the jury's finding that the conspiracy found pursuant to Interrogatory No. 3 was the proximate cause of harm to the plaintiff. We reach this conclusion because three categories of evidence indicate that the conspiracy to limit competition prevented Affiliated from obtaining a franchise: (1) circumstantial evidence flowing from the nature of the conspiracy; (2) evidence that Gulf Coast in conjunction with the City Council vetoed approval of Affiliated's application; and (3) evidence that the plaintiff would have been awarded a franchise on the merits in the absence of a conspiracy limiting competition on the merits.

First, Affiliated was the leading rival of Gulf Coast and the other conspirators. The exclusive nature of the conspiracy itself and Affiliated's failure to obtain a franchise is circumstantial evidence from which the jury could infer that the conspiracy operated to exclude Affiliated, a non-conspirator who was very likely to have received a franchise through competition on the merits. In *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), the Supreme Court held in a trial before the court that it is proper for the trial judge to infer damages from circumstantial evidence. The court noted that "the injury alleged by Zenith was precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause. The trial court was entitled to infer from this circumstantial evidence that the necessary causal relation between the pool's conduct and the claimed damage existed." *Id.* at 125, 89 S.Ct. at 1577 (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696–701, 82 S.Ct. 1404, 1409–1412, 8 L.Ed.2d 777 (1962)). Failure of a nonconspirator to obtain a franchise is exactly the type of loss that a conspiracy to preclude competition for franchises is likely to cause when the entity awarding franchises participates in the conspiracy.

Moreover, even though the jury found the boundary agreements legal, it could

properly consider evidence concerning those agreements as demonstrating the defendant's intent to conspire. *See, e.g., United Mine Workers of America v. Pennington,* 381 U.S. 657, 670 n. 3, 85 S.Ct. 1585, 1593 n. 3, 14 L.Ed.2d 626 (1965); *United States v. Southern Motor Carriers Rate Conference,* 439 F.Supp. 29, 47 (N.D. Ga.1977). This evidence when considered cumulatively with other independent evidence of a conspiracy to exclude anyone who did not join the conspiracy also supports the jury finding of proximate cause. Consequently, the jury's ruling on Interrogatory No. 5 is supported by circumstantial evidence that the conspiracy itself caused Affiliated's injury.

When direct evidence points to a conspiracy to injure the plaintiff, as in the case at bar, a court can find causation on the basis of circumstantial evidence and inference. As this court has noted: "[i]n cases where the defendants' acts are motivated by intent to injure the plaintiff, the inferential leap to the finding of fact of damage is not great. Indeed, one court has found it virtually nonexistent: 'Such damage need not be made patent item by item as on a balance sheet. The mere unlawful combination over a period of time to eliminate competition is proof of damage.'" *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 855 (5th Cir.1981) (quoting *Fox West Theatres Corp. v. Paradise Theatre Building Corp.,* 264 F.2d 602, 608 (9th Cir.1958)).

Second, the record contains sufficient evidence supporting the inference that co-conspirators prevented Affiliated from obtaining a franchise. The trial court agreed with plaintiff's assessment that Interrogatory No. 3 reflects the jury's "apparent conclusion that the conspiracy to limit competition was an agreement or understanding that franchises would be awarded only to those applicants that were approved by Gulf Coast and other nondefendant participants." 519 F.Supp. at 998. The trial court held, however, that there is no evidence in the record "either direct or inferential, [that] provides the necessary connection between the second theory of conspiracy to exclude non-conspirators and the

plaintiff's failure to receive a franchise." 519 F.Supp. at 1006.

We disagree; substantial inferential evidence exists. For example, Affiliated's attorney, Al Levin, testified that when he talked to Assistant City Attorney Adrian Baer in November he was told that "the decision as to who was going to get what areas, specifically in terms of the actual boundaries, were still under negotiations, but the decision as to who was fait accompli." Plaintiff's exhibit No. 151, at 84. When Levin then contacted Gulf Coast's attorney he was told "as far as I am concerned, Al, it's too late; the pie has already been cut." We note that the trial court itself recognized that "[a]n inference can be derived from th[e] testimony [of Al Levin] that the defendants had decided who would get franchises regardless of what geographic areas the franchises would cover." 519 F.Supp. at 1000 n. 11. In other words, the decision of whom to exclude from the award of franchises did not hinge on the boundary agreements. Under the terms of the conspiracy, applicants who joined the plan obtained a franchise and those who wished to compete for a franchise received nothing.

Direct evidence exists that under the conspiracy, Gulf Coast and the other conspirators, in conjunction with the Mayor and City Council had the power to approve or veto plaintiff's attempt to obtain a franchise. Mayor McConn stated that his vote was subject to the wishes of the conspirators because of their political clout. 519 F.Supp. at 1016. Councilmen Goyen, Robinson, and Westmoreland testified that they would have voted to grant Affiliated a franchise if Gulf Coast and the other applicants had given their blessing. 519 F.Supp. at 1004. After hearing Affiliated's presentation at a City Council meeting on December 12, 1978, two Councilmen encouraged the City Legal Department and the applicants to "see if [you] can work out something." A document prepared by the City between November 28, 1978, and December 20, 1978, provided for changed boundaries, noting that "I-10 line shifted to Hwy. 290 without Goldberg's tract—contingency." Plaintiff's exhibit 56. The

record evidence reveals that this alternative was contingent upon the approval of Gulf Coast and the other conspirators. Reasonable men could certainly have drawn the inference that Affiliated's application was denied because Gulf Coast and the other participants in the conspiracy vetoed its application.

Third, the record contains evidence that absent a conspiracy, Affiliated would have obtained a franchise on the merits of its application. Citing Malarkey's testimony, the trial court held that all of the applications, including plaintiffs, were "well below standard and not at all informative as to many important aspects of the franchise application." 519 F.Supp. at 1009. Although this conclusion is debatable, there can be little doubt that Affiliated was more qualified to receive a franchise than the five successful applicants. Moreover, the evidence demonstrates, so the jury could infer, that Affiliated would have received a franchise if the conspiracy had not prevented a consideration of its application on the merits. Malarkey testified that the most important part of a franchise application concerns a firm's financial qualifications. He testified that Affiliated's application was the only one that contained enough financial information to have permitted the City Council to make a preliminary decision as to its ability to construct a cable system. He stated that Affiliated was financially qualified and that Gulf Coast was not. The last audited financial statements contained in Affiliated's application reveal that it had assets of $25,294,266 and equity of $18,-

622,383. Plaintiff's exhibit 83. Gulf Coast, on the other hand, had assets of $366,259 and equity of $327,259. Plaintiff's exhibit 10. Moreover, by 1980 many of the conspirators had been bought out by out of town corporations and Gulf Coast had borrowed half of its debt from another company. Plaintiff's exhibit 55, at part II, § 1. Affiliated, on the other hand, had the qualifications of close ties to the community it sought to serve and the capacity to provide immediate service. We find that the jury could properly infer from the preceding evidence that Affiliated would have obtained a franchise if the conspiracy to exclude nonconspirators had not eclipsed competition on the merits.

## V.

### NOERR–PENNINGTON DOCTRINE

 The *Noerr-Pennington* doctrine provides an exception to antitrust liability enabling citizens or business entities to influence or to petition public officials to take official action that will harm or eliminate competition. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). When such petitioning is a mere sham or the public officials are participants in the conspiracy, however, there is no exception to antitrust liability. The trial court instructed the jury fully and correctly with regard to the *Noerr-Pennington* doctrine,[6] the State Action Exemption, and Legislative Process Immunity.

---

**6.** Indeed, if the instruction was anything but neutral it was favorable to the defendants. It provided:

Defendant Gulf Coast claims that the agreements with Houston Cable and Westland to divide or allocate territories within which certain applicants would apply for a franchise constituted an exercise of Gulf Coast's right to petition government and therefore falls outside the scope of the Sherman Act. The Constitution ensures the right of all persons, whether acting individually or in concert, to petition government for political action, recognizing that persons in the exercise of these constitutional rights naturally will petition government for political action that is favorable to their particular interests and unfavorable to the interests of

others. The Supreme Court has declared that this right to petition government for political action is paramount, and that the concerted effort of various parties genuinely to influence public officials does not in any way violate the antitrust laws regardless of intent or purpose. Joint efforts truly intended to influence public officials to take official action do not violate antitrust laws even though the efforts are intended to eliminate competition, unless one or more of the public officials involved was also a participant in the illegal arrangement or conspiracy.

Accordingly, you must determine whether any City official participated in the alleged conspiracy, as that term is defined in this Charge. You may not infer that any member of the City

■ In its answer to Interrogatory No. 3 the jury found a conspiracy and implicitly found that the defendants were not entitled to immunity. In analyzing the jury's ruling the trial court produced an exhaustive study of why the public co-conspirator exception to the *Noerr-Pennington* doctrine was applicable to the instant case. The district court's analysis of this issue and the record evidence is thorough and correct. 519 F.Supp. at 1016–23. Therefore, we need not recount his analysis and reasoning. Numerous examples of official involvement in the conspiracy abound, which indicate that the trial court did not err in finding that the co-conspirator exception applied. For example, the City fired its own expert when he wrote a report unfavorable to Gulf Coast, and then it doctored his report. We agree with the trial court's assessment that the actions of the Mayor and City Council indicate a "vigorous involvement in orchestrating certain aspects of the conspiracy." Thus, its application of the co-conspirator exception was correct.

■ Since the trial court found the co-conspirator exception applicable it did not discuss the sham exception. We note

that a defendant cannot rely on *Noerr-Pennington* immunity when the activity to influence government action is a mere sham to hide what is essentially an attempt to interfere with a competitor's business. *Eastern R.R. President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961). Petitioning calculated to deny a competitor meaningful access to a governmental entity is within the sham exception to *Noerr-Pennington* immunity. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 512, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972); *Mason City Center Ass'n v. City of Mason City*, 468 F.Supp. 737, 745 (N.D.Iowa 1979). Whether or not such conduct is within the sham exception is a fact issue for the jury. *Feminist Women's Health Center v. Mohammad*, 586 F.2d 530, 543 (5th Cir.1978), *cert. denied*, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979).

Appellee argues that Affiliated was not denied access to the City Council but had an opportunity to present its application formally and informally. Appellee ques-

Council or the Mayor was participating in or acting in furtherance of a conspiracy simply because that person accepted or agreed with a position urged by an applicant. A public official's communications with a constituent, even if that official thereby is influenced to favor the constituent, is within the parameters of the legislative process, and cannot violate the antitrust laws so long as the officials' activities are not the product of an illegal arrangement.

Also you must determine whether the petitioning activities of the defendants Gulf Coast, Clive Runnels or Jack Trotter were genuine attempts to influence public officials with regard to political action.

The petitioning activity must be genuine. Protection does not extend to purported petitioning that is in fact a mere sham to cover what actually is nothing more than an attempt to interfere directly with the business of a competitor. That is, protection does not extend to activities that are merely a pretext for inflicting on plaintiff an injury not caused by any government action.

Thus, if you should conclude from your review of the evidence that defendants City of Houston and Mayor McConn did not participate in any illegal agreement or conspiracy and that defendants Gulf Coast, Runnells and Trotter did nothing more in his case than meet with other franchise applicants and with City officials for

the purpose of persuading the City to award them a cable television franchise on some basis, and in furtherance of that objective they reached boundary agreements with the Houston Cable and Westland groups, then you may not find that these defendants violated the antitrust laws. Even if you believe that the purpose or the necessary effect of meetings attended by Gulf Coast or its representatives was to exclude plaintiff from obtaining a franchise, you may not find that the defendants were guilty of a conspiracy in restraint of trade if you believe that the defendants' conduct genuinely was aimed toward influencing the City to take favorable action toward them in granting a franchise. On the other hand, if you find that the activity was not really an attempt to influence an official to take official action, but was nothing more than a sham—an attempt to interfere directly with the business of a competitor, you may consider those actions and any reasonable inferences you may draw from those actions in determining whether defendants engaged in a conspiracy in violation of the antitrust laws.

The burden of proof with regard to this instruction is on the defendants. They must prove by a preponderance of the credible evidence that the petitioning activities were genuine.

tions the applicability of *California Motor Transport, supra* (where the defendant used frivolous lawsuits to deny a competitor access to a court or agency), in the legislative context of a city council awarding franchises. *See* 1 P. Areeda & D. Turner, *Antitrust Law* ¶ 203 (1978). We need not reach this disputed issue because the defendants' activities were clearly within the co-conspirator exception as the jury implicitly found in its answer to Interrogatory No. 3. We note in passing, however, that the record may indeed contain enough evidence to justify application of the sham doctrine. While in the process of trying to obtain a franchise, Affiliated's attorney was told by Gulf Coast's attorney that the political realities were that "(t)he city is locked up by five franchises." Record on Appeal, vol. 22, at 34. This and similar evidence of the activities of McConn, the City Council and the other co-conspirators may have effectively blocked meaningful access to a fair and impartial consideration of Affiliated's application by the city such that the sham exception applies.

## VI.

### THE MAYOR'S IMMUNITY

■ Appellee McConn argues that he is entitled to absolute, or in the alternative, qualified immunity. This circuit and others have recognized that a municipal official acting in his legislative capacity is entitled to absolute immunity from civil suits. *E.g., Hernandez v. City of Lafayette*, 643 F.2d 1188 (5th Cir.1981), *cert. denied*, 455 U.S. 901, 102 S.Ct. 1242, 71 L.Ed.2d 440 (1982); *Bruce v. Riddle*, 631 F.2d 272 (4th Cir. 1980); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607 (8th Cir.1980).

In *Hernandez*, we held that local legislators are entitled to absolute immunity for conduct in furtherance of their duties. We also recognized that although a Mayor is the Chief Executive Officer of a city, "he is entitled to absolute immunity from suit for acts taken in a legislative capacity." 643 F.2d at 1193 (citing *Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 731–34, 100 S.Ct. 1967, 1974–76, 64 L.Ed.2d 641 (1980)).

Although the Mayor of Houston serves in the traditional executive role, he also presides over and has a vote in the City Council, which functions as a legislative body. McConn contends that his activities connected with the award of the cable franchises were "more closely akin to that of a legislator than an executive." Since we find that McConn is entitled to qualified immunity we need not reach the question of his absolute immunity. We note in passing, however, that on the facts before us it is unlikely that he is entitled to absolute immunity.[7]

---

7. "[T]he Supreme Court has long held that no immunity exists for actions outside the sphere of legitimate legislative activity." *Espanola Way Corp. v. Meyerson*, 690 F.2d 827, 829 (11th Cir. 1982), *cert. denied*, 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983). Although McConn's votes at the City Council meetings and some of his other activities were part of the legislative process, he also undertook substantial acts outside of his legislative capacity, which were neither legitimate nor in furtherance of his legislative duties. Mayor McConn participated in and promoted an illegal conspiracy, and intervened several times to apply pressure on Affiliated and the conspirators, doing so outside of his legislative capacity.

The Mayor testified that the franchise process was conducted in an open, public forum. The Public Service Department prepared a questionnaire for all applicants and hired a consultant to evaluate the applications. The public was thus lead to believe that there would be competition on the merits for the franchises, even if the competitors drew the particular boundary lines.

The city's expert criticized the application process, determined that only two applicants were qualified, and that three applicants, including Westland, should be rejected.

The Mayor did not adhere to the publicly announced program of granting franchises on the basis of critical evaluation. Instead, the franchise ordinance was drafted by the conspirators, the expert was fired, his report doctored, and the City Council's decision was made solely on the basis of who participated in the conspiracy.

The Mayor did not publicly reveal that to repay a personal debt he had intervened to guarantee a franchise for his lawyer. He never announced that the city's expert had been fired because his recommendations were contrary to the design of the conspiracy. He did not inform the public that the expert's report had been altered to make the conspirators' applications appear qualified and meritorious. He never admitted that the information in the applications was not a factor in the decision-making process. These facts and others belie the contention that the Mayor's acts were part of a

The trial court's interpretation regarding qualified immunity is inapplicable now because the court did not have the benefit of the Supreme Court's decision in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow* the Court announced that the question of qualified or good faith immunity for public officials is to be determined under an objective standard. The court held that:

> government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

457 U.S. at 818, 102 S.Ct. at 2738. Assuming that the law in question was clearly established, an official can still prevail if he can show "extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard." *Id.* at 819, 102 S.Ct. at 2739.

McConn contends that the state of the law regarding a municipal official's liability for an antitrust violation was unsettled in 1978. Since he could not have known that he would be liable for violating the antitrust law, he argues that he is entitled to qualified immunity.

We take note of the fact that at the time the franchises were granted it was unclear whether or not an antitrust violation occurred under the rule of reason when a city let franchises in an uncompetitive manner. Second, it was uncertain whether or not home rule cities were entitled to *Parker* immunity. *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). There were several recent cases indicating that a city or political subdivision of a state could not use *Parker* immunity to avoid the antitrust laws without a state mandate to displace competition. *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (decided March 29); *Whitworth v. Perkins*, 559 F.2d 378, 381 (5th Cir.1977), *judgment vacated*, 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *judgment reinstated*, 576 F.2d 696 (1978) (decided July 17) (per curiam); *Kurek v. Pleasure Driveway and Park District of Peoria*, 557 F.2d 580 (7th Cir.1977), *judgment vacated*, 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *judgment reinstated*, 574 F.2d 892 (7th Cir.1978) (decided Sept. 18) (per curiam), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979); *Woolen v. Surtran Taxicabs, Inc.*, 461 F.Supp. 1025, 1029 (N.D.Tex.1978) (decided Nov. 29); *United States v. Texas State Bd. of Public Accountancy*, 464 F.Supp. 400, 403–04 (W.D.Tex.1978) (decided May 5), *modified on other grounds*, 592 F.2d 919, *cert. denied*, 444 U.S. 925, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979); *Star Lines, Ltd. v. Puerto Rico Maritime Shipping Auth.*, 451 F.Supp. 157, 166 (S.D.N.Y. 1978) (decided May 3). *Contra Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220 (7th Cir.1975).

The cases indicating liability, decided as or shortly before the franchise process occurred,[8] were breaking new ground and were not clearly established. Moreover, the guidance from the Supreme Court was limited because *Lafayette* was a plurality opinion. *See Hybud Equip. v. City of Akron*, 654 F.2d 1187, 1195 (6th Cir.1981), *judgment vacated*, 455 U.S. 931, 102 S.Ct. 1416, 71 L.Ed.2d 640 (1982). It was not until *Community Communications Co. v. Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70

---

legitimate legislative process. As Judge Bue noted, the City was "vigorous[ly] involve[d] in orchestrating certain aspects of the conspiracy" and the Mayor "directed" some of the activities of the conspirators as "an active co-conspirator not content merely to accede to the wishes of private parties." 519 F.Supp. at 1014, 1016. The illegitimate nature of the Mayor's actions explains why the jury found Runnels (Gulf Coast's attorney) and Trotter (financier) innocent, yet held McConn guilty—despite a generous *Noerr-Pennington* instruction.

**8.** In July and August of 1978, Houston began taking applications for franchises. In October the city hired an expert and in November the plaintiff applied for a franchise. On November 29, 1978, the city ordinances were tabled and the plaintiff was granted a hearing on its application. On December 12, 1978, the plaintiff made its presentation and all applications were thereafter referred to the Public Service Department for evaluation. On January 10, 1979, the final franchises were awarded.

L.Ed.2d 810 (1982), that it became clearly established that a home rule city was not entitled to blanket *Parker* immunity and could thus be liable for violating antitrust law. Consequently, the mayor could not, nor should not, have known that he was violating a clearly established law.

Although we find that the Mayor can avail himself of qualified immunity, we emphasize that this ruling does not effect his status as a conspirator. The jury found that the Mayor was a conspirator and we do not disturb this finding. The Mayor is absolved of liability only because applying the *Harlow* immunity standard he did not, as a matter of law, violate a clearly established law.

At oral argument McConn's attorney opined that municipal politics are municipal politics and that the appropriate remedy for the Mayor's acts was exercised by the voters of Houston when they booted McConn out of office. *See Tenney v. Brandhove*, 341 U.S. 367, 378, 71 S.Ct. 783, 789, 95 L.Ed.2d 1019. Certainly currying political favor is the hallmark of a good politician and is neither illegal nor violative of the antitrust law. Nevertheless, in future cases involving franchise letting, when an elected official instigates, directs, or actively participates in an illegal conspiracy designed to circumvent competition on the merits—when the state has not provided the city with an anticompetitive mandate—a reasonable man should know that such actions violate clearly established antitrust law.

Judgment n.o.v. should not have been granted and the court below is hereby RE-VERSED with instructions to reinstate the jury verdict and grant the plaintiff judgment against Gulf Coast only.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring specially:

I

To understand the limits of our holding it is important that we isolate the conduct found illegal. The jury's answer to interrogatory number one tells us that the conspiracy in unreasonable restraint found in number three *did not* include "agreements on boundary lines so as to divide the geographic areas for which these applicants would seek cable television franchises." On the evidence, reconciliation of the answers to interrogatories one and three requires the conclusion that the jury found that the city and the private defendants agreed that Affiliated's application would not be considered—that the city would not consider an application from companies not approved by the original five applicants for franchises. The jury could thus have concluded that the principal purpose of the concerted activity was not to influence public officials or to further any proffered goal of the city other than that of blocking competitive access. Reconciliation of the jury's answers leaves little room for any conclusion that the jury decided otherwise.

The point here is more than whether evidence supports the jury verdict. The relevant point is that the *only* conduct condemned today is an agreement between the city and private defendants to deny a competitor access to the process created by the city for the awarding of franchises. The majority opinion does not otherwise judge the legality of the process. The holding today is then relatively straightforward in its condemnation of a classic restraint and the antitrust rule for municipalities which emerges is a modest one indeed.

Equally, our decision should not be read to imply that a municipality must employ competitive bidding in the award of all contracts and franchises or the procurement of all goods and services. Such a conclusion would be inferable only if we were to hold that the public interest in competition must predominate over other legitimate municipal interests as it predominates over the private profit motive. Emphatically, we have not so held.

The municipal defendants have stated that they intended to favor minority businesses and locally-based businesses, but, even assuming that both of these are legitimate public purposes, neither policy explains the selection of the Gulf Coast consortium in preference to Affiliated. These defendants have also testified that they

hoped to avoid the burden of selecting between competing applicants for particular franchise areas, and only the Gulf Coast group presented a package proposal featuring total city coverage with no overlapping boundaries. Selecting from among competing applicants those companies most fit to provide cable service to the citizens of Houston was a paradigmatic governmental function, and it is difficult to conclude that the desire of the mayor and city council to escape making this determination was itself a legitimate municipal purpose.[1] As the municipal defendants have thus failed to advance any public policy justifying their conduct, I conclude that the jury was warranted in concluding that their anticompetitive actions merit the imposition of antitrust liability.

## II

Isolating the restraint which we today condemn also places in perspective the limits of our rulings regarding First Amendment protections of petitions for redress. The *Parker* principle stunted the growth of *Noerr-Pennington* until *City of Lafayette* and *City of Boulder* were decided. The full reach of *Noerr-Pennington* by necessity is now open for exploration. But today we do no exploring. In the present posture of this case there is no petition to government at issue. We do not face a successful request for governmental action with anticompetitive results where the participation of government was confined to that of decisionmaker. Instead, the condemned conduct included active participation by the city with citizens in the exclusion of a competitor. Resolution of the host of difficult issues traveling under the *Noerr-Pennington* rubric must await another day.

In sum, I concur with Judge Garza's opinion and add this separate writing in parts I and II only to identify issues we do not decide today. I continue in part III to

highlight an issue presented by the application of antitrust laws to municipalities and implicit in today's decision.

## III

The Supreme Court in *City of Lafayette* and *City of Boulder* left the inferior courts with the exquisite task of fitting the antitrust laws to municipal government. The rule of reason is at the center of the uncertainty.

Basic antitrust principles teach that private citizens and corporations cannot weigh the public good against the competitive impact of their agreements.[2] It is, for example, no answer to price-fixing charges that competitive letting of design work will cause inferior design. It is for government to weigh the public good against any anticompetitive impact. When the antitrust laws are then found to be applicable to municipalities, how we may balance the competitive impact of decisions by city government against the perception of the public good is uncertain.

This question is posed when city government acts in its unique role of local government, whatever be the issue when it acts as a consumer of goods and services. Arguably, when the city enters the marketplace to compete for the custom of others, or to purchase window cleaners for the City Hall windows, its activity is virtually indistinguishable from private business. Where, however, the city acts as a regulator or governor of the sales and deliveries of goods and services to its constituents, it is engaged in a role dissimilar from that of private business.

In our economic system, private business enterprises are presumed to respond predominately, if not exclusively, to the profit motive. By contrast, the concept of "profit" *per se* is alien to the purposes of a unit

---

1. Regardless, the jury could have inferred from the evidence that the city and the defendant applicants agreed that no other applicant would be considered without their permission. It is difficult to defend action as being that of city government, with all the weight such ought to carry, when the decisionmaking is placed in the hands of private potential competitors.

2. Given the procedural posture of this case, the parties do not attack the jury instruction regarding rule of reason. Regardless, how the rule is actually applied gives it meaning apart from its traditional phrasing.

of government. Consequently, the clash of interests necessitating an antitrust law—the private desire to reap extra-normal profits versus the public interest in free competition—will not appear in its traditional form when the accused antitrust conspirator is a governmental entity.

The underlying principle of the antitrust laws, starkly stated, is that when the private pursuit of profit conflicts with the public interest in competition, the public interest shall prevail. In turn, the traditional "rule of reason" states that a present constraint on competition may be justified only by an ultimately pro-competitive effect. Other societal benefits which may allegedly flow from an anticompetitive act are irrelevant because it is not the businessman's prerogative to determine how those benefits may best be obtained. Rather, we presume that competition will ordinarily be attended by greater social benefits than any other market structure. It is then the prerogative of government alone to determine when the competitive process is inadequate to meet the needs or the best interests of society. In such cases, the government may pursue three related and often-overlapping courses: It may replace or restrict competition, for example by adopting a licensing procedure; it may supplement competition, for example by enacting product safety or anti-pollution laws; and it may substitute for competition, for example by regulating the price charged by a natural monopolist.

Though the majority has not addressed this issue directly, its opinion signifies amenability to the rationale that the "rule of reason" which applies when the accused is a governmental entity must differ from that encountered when the accused is a private business. This is so because the majority opinion ultimately rests on a duty of the city to justify the absence of competition in awarding franchises; political patronage is not justification. Under this rationale, public interests other than competition can be balanced against the interest in competition, because it is the particular prerogative of government to advance these other interests. Thus, for example, there was evidence in this case that the City of Houston planned to favor minority-owned businesses in awarding the cable franchises. Such a policy is anti-competitive in that it accords an advantage to certain businesses based on a non-economic criterion, but no antitrust liability should result if one decides that the advancing of public policy is "legitimate" and outweighs any adverse impact on competition.

The majority does not surface the problem, but, by analogy to other uses of private suits to implement social goals, such a rationale ought to be implemented by allocating to the party best equipped to make the proof the burden of going forward with the evidence. Thus, when a plaintiff has established a prima facie case of anticompetitive conduct by a municipal defendant, the burden on the municipality would then be to articulate legitimate governmental interests advanced by its conduct which put at issue whether the gains reasonably expected to be achieved by its anticompetitive conduct justify the degree by which competition was reasonably expected to be diminished. The ultimate burden of persuasion that the restraint, so measured, was unreasonable, would be on the plaintiff.

Application of such a rule will not be easy. Critically, such a rule does not reconcile applicability of the federal antitrust laws to municipalities with those principles of federalism which counsel deference to the balancing of public interests performed by local units of government under authority delegated by the states. To the contrary, it would give to the courts the task of balancing a municipal objective against its anticompetitive effect. Reviewing the "reasonableness" of such restraint could travel against our commitment to federalism.

A rule of reason analysis that allows government purpose to be directly weighed against competitive impact seems antithetical to federalism. Yet, the premise of this concern is that decisions by municipal government reflect a species of governmental choice and that such review is an intrusion of the federal government into the affairs of local government. This pre-

mise, however, fails to accept that in this sense the majority opinion in *City of Boulder* denied the sovereignty of municipal government (we are not a nation of city states). In doing so, the court sanctioned this intrusion into free decision-making in a manner not dissimilar to limitations placed upon private business.

Finally, not to weigh the purpose of the restraint and the presence of less anticompetitive alternatives to achieving the purpose would render the rule of reason illusory, for its essence is balance. In sum, the weighty concerns about subjecting decisions of municipal government to traditional rule of reason measures were presumably considered and found insufficient to overcome the pro-competitive policies underlying the antitrust laws when the Supreme Court removed municipalities from the cover of *Parker v. Brown.* While in my view this is a treacherous path, as an inferior court we must accept that judgment and I read the majority opinion as doing so.

CLARK, Chief Judge, with whom REAVLEY and E. GRADY JOLLY, Circuit Judges, join, dissenting in part.

This case came to be reheard en banc because the panel held that the City of Houston, its mayor and a cable franchise applicant committed a *per se* violation of Section 1 of the Sherman Act. The en banc court abandons that position. Although the reasoning it substitutes lacks the sweep of the prior error, it remains just as wrong in reversing the district court's judgment in favor of Gulf Coast.

Initially, the majority fails to make the critical determination of relevant market. It compounds this legal error by choosing its own path through the facts to arrive at a result which ignores the contrary initial fact finding of the jury and the trial judge's fact reconciliation of the jury's two inconsistent findings. The result is to saddle a bidder for a municipal franchise with an erroneous 6.3 million dollar award for actions that are no more an antitrust offense than would be an agreement to establish separate churches in different parts of town.

*Relevant Market*—The majority acknowledges that the city started this unfortunate affair when it made a political decision to let multiple franchises for cable TV coverage in Houston. What the majority then promptly ignores is that this final decision established the relevant market for each competitor as, not the city of Houston, but each discrete segment of the city that any competitor for a franchise wanted to designate. This elemental truth negates every anticompetitive conclusion the majority draws. When the proper concept of relevant market is put with the jury finding that there was no conspiracy in restraint of trade in the agreements which drew the proposed boundary lines, every doubt that this is not an antitrust case disappears. Affiliated Capital could have competed in any one or more of the relevant markets designated by any applicant in the defendant group. Affiliated Capital could have competed in yet different markets by forming its own group and dividing territories differently. When it belatedly demanded a choice piece of Gulf Coast's territory, the rebuff was neither conspiratorial nor anticompetitive.

*Inconsistent Special Verdicts*—The jury determined that the boundary line agreement to divide geographic areas between franchise applicants was not part of a conspiracy in unreasonable restraint of trade. This finding is a lion in the street for the majority's fact conclusions on causation. This jury fact finding was not a casual aside. The plaintiff insisted this was a major fact issue in the case. The court's instructions as well as its interrogatories made it so. How does the majority harmonize this critical, well supported finding which the trial judge who heard and saw the witnesses found controlling? It recasts the jury's first special verdict—which found the boundary agreements were not part of a conspiracy in unreasonable restraint of trade—as a finding that multiple franchises were preferable to one.

The majority's forced reconciliation of the jury's answers to interrogatories 1 and 3 is no reconciliation at all. It merely substitutes this court's finding for that of

the jury. The only reasoned path to resolution of the case through reconciliation of the jury's otherwise inconsistent answers is that followed by the trial court—to grant judgment for the defendants on the basis of no causation.

Alternatively, conceding for the sake of argument that there could be some basis for finding causation of damage to plaintiff in a conspiratorial refusal by Gulf Coast to remake a valid boundary agreement, the decision of this court should be that the jury's answers to interrogatories were internally inconsistent and that a new trial is required. *Guidry v. Kem M'f'g Co.*, 598 F.2d 402 (5th Cir.1979); Wright and Miller Federal Practice and Procedure Civil § 2510. But the majority enters its own verdict on inconsistent findings remade at the appellate level. This is wrong.

*Lack of Antitrust Injury*—Still more wrong is the court's approval of the use of the Sherman Act in this dispute to wound one who competed on the city's terms and reward a summer soldier who did not. The antitrust laws were not intended to restore losses caused by business mistakes or free market forces. Affiliated Capital, for reasons of its own, did not seek a cable TV franchise until others interested had legally agreed on market areas. That default is the sole proximate cause of its failure to get a franchise.

I concur in the result reached in Part VI of the majority opinion as to the mayor's qualified immunity. I also agree with the view expressed in Judge Higginbotham's concurring opinion that the majority's decision should not be read as a ruling that cities must use competitive bidding to award contracts and franchises. Such a ruling would drastically impede the development of a law of municipal antitrust liability which accords proper deference to municipal decision-making.

I respectfully dissent from the partial reversal of the judgment.